STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FRANK J. ROSCUS, DEFENDANT-APPELLANT.

Argued October 18, 1954—Decided November 15, 1954.

416

418

*Mr. Frank B. Bozza* argued the cause for the appellant (*Mr. George D. McLaughlin,* attorney).

*Mr. Charles V. Webb, Jr.,* Essex County Prosecutor, argued the cause for the respondent (*Mr. Maurice J. McKeown,* Assistant Prosecutor; *Mr. C. William Caruso,* on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J. The jury returned a verdict against the defendant of guilty of murder in the first degree without a recommendation of life imprisonment and the mandatory death sentence was imposed by the court.

The facts are not in dispute. The defendant, a shop steward 33 years of age, left his home in Newark at approximately 7:40 on the morning of January 9, 1953, drove his car to the plant and reported to his foreman that he was suffering from a heavy cold and was not going to work that day. He spent the entire morning and a part of the afternoon consuming liquor at various taverns, confining his drinking to straight whiskey with water for a chaser. At about 2:30 P. M. he borrowed $100 from a loan company,

pledging as security the bill of sale for his truck. He then proceeded to a sporting goods store where he purchased a shotgun, and a box of shells, the latter containing 12-gauge double-O buckshot, the heaviest sold by that store. He bought the gun because he "knew there was a union meeting that night and I wanted to straighten out three guys in the union; these were John Waters, the business agent, a fellow by the name of Coogan, the organizer, and a fellow by the name of Mitchell of the Executive Board." Using a saw which he had in his car, he sawed off the barrel of the gun.

At about 6 P. M. and then again a short time later, he returned to the store to obtain instructions from the clerk as to how to operate the gun. The defendant then resumed his visits to various taverns where he consumed several more drinks of whiskey. At about 8 P. M. he drove to the Continental Ballroom on Broad Street, Newark, to attend the union meeting, taking the loaded shotgun with him. During the meeting John Waters got up to leave and the defendant shouted to him "You're not going anywhere," and started to bring his gun into shooting position. Waters ran into another room and closed the door, so the defendant fired a shot in the general direction of the door. He then forced his way into the room and in the ensuing struggle with Waters lost his gun, but managed to escape from the building. It is to be noted that the State endeavored to strike any testimony relating to this shooting, but that the defendant and his counsel insisted that it be admitted in evidence.

The defendant then returned to the sporting goods store and purchased another shotgun, sawed off the barrel, loaded it, and decided to look for Samuel Cuzzolino, nicknamed Trixie King, a man with whom he had previously had several run-ins and towards whom the defendant admitted great animosity—"If I found him it was in my mind to kill him. I figured that I was in it and that I might as well go all the way." The defendant was driving around Newark looking for Trixie King when he saw the car belonging to Edward Foster, another of his enemies, parked in front of Freddie's Tavern on Mulberry Street. The defendant decided to enter

the tavern and "give Foster a blast and square up some debts with him." Spying Foster at the bar he called to him and Foster dashed across the floor and hid behind the jukebox. The defendant fired several shots in his direction, but missed him. The defendant then went outside, reloaded the gun, returned to the tavern and fired another blast into the men's room and then left. It was then about 9:30 P. M.

He then reloaded his gun and proceeded to cruise around in his car, again looking for Trixie King. Upon discovering Trixie's car outside the Six Corners Tavern the defendant entered the bar, had two drinks of whiskey, and then went outside returning within a few minutes with his shotgun. Taking a position about six feet behind the chair where Trixie King was seated he called out—"Well, Trixie, I waited a whole year for this," raised the gun to his hip, and as Trixie dove for it, pulled the trigger and fired a blast that hit Trixie in the stomach, killing him almost instantly. The defendant left the tavern and drove to two other taverns, looking for some of his other enemies. He was finally captured by the police in front of Freddie's Tavern, where he was seated behind the wheel of his car with the shotgun in his lap.

Defense counsel admits that the defendant committed the killing and that the shooting was willful and deliberate, but he contends that there was an absence of the premeditation essential to a conviction of first degree murder. At the trial he attempted to prove insanity as well as such intoxication as would deprive the defendant of the ability to formulate the specific intent to kill necessary for first degree murder. On these issues the defendant and other witnesses were called, whose testimony dealt with head injuries received by the defendant as a young boy, while in the Army, and in later life. There was also testimony as to his habits of excessive drinking. At one stage in the trial the court, in the absence of the jury, held an inquiry pursuant to *N. J. S.* 2A:163-2 into the defendant's sanity, and as a result of this inquiry the court was satisfied as to the defendant's ability to proceed with the trial. The issues of insanity and intoxica-

tion were submitted along with other issues to the jury. The jury returned a verdict of guilty of murder in the first degree without any recommendation for life imprisonment, and the appeal is here pursuant to *Article* VI, *Section* V, *paragraph* 1 of the *New Jersey Constitution* and *R. R.* 1:10–1(*b*).

Counsel contends that there was reversible error in admitting testimony of the shooting in Freddie's Tavern, because it was an isolated offense unconnected with the killing of Trixie King, and because such testimony was prejudicial to the defendant and highly inflammatory. It is, of course, true that evidence of the commission of other crimes by the defendant is inadmissible to prove the commission of the offense for which he is being tried, *Bullock v. State*, 65 *N. J. L.* 557, 574 (*E. & A.* 1900); *State v. Young*, 93 *N. J. L.* 396, 404 (*E. & A.* 1919); *State v. Donohue*, 2 *N. J.* 381, 388 (1949); *State v. Schmieder*, 5 *N. J.* 40, 47–48 (1950). It is, however, equally well settled that where the commission of a former crime evinces a state of mind that is carried forward and is shown to exist at the time of the commission of the crime charged, and the former crime is so related to the crime charged as to time, place, and circumstances that the state of mind may be said to be continuous, evidence of the former crime is admissible, *State v. Deliso*, 75 *N. J. L.* 808, 816–817 (*E. & A.* 1908); *State v. Ehlers*, 98 *N. J. L.* 236, 247 (*E. & A.* 1922); *State v. McNamara*, 116 *N. J. L.* 497, 499 (*E. & A.* 1936); see also *Uniform Rules of Evidence, Rule* 55. As stated in *State v. Donohue, supra*, 2 *N. J.* 381, at 388, "such evidence is admissible, however, to show malice or ill will on the part of an accused toward the victim or when it tends logically to prove against him some particular element of the crime for which he is being tried, *State v. Lederman*, 112 *N. J. L.* 366 (*E. & A.* 1934)."

The testimony concerning the shooting of Foster at Freddie's Tavern was admitted only for the purpose of revealing the defendant's state of mind; it was evidential on the issue of whether the killing was premeditated. The

shooting took place approximately one hour prior to the killing of Trixie King; the shooting was done with the same gun; it was a part of the continuous round of killings on which the defendant had determined. The trial judge properly instructed the jury as to the effect of this testimony:

"You will recall that I allowed certain testimony to be introduced into evidence by the State regarding a shooting at 424 Mulberry Street where defendant allegedly shot at one Foster. That evidence was allowed by the Court for the limited purpose of showing the state of mind of defendant, Roscus, within several hours of the killing of Cuzzolino and for no other purpose.

Thereafter, the defendant, as part of his defense, introduced evidence not only of the shooting at 424 Mulberry Street but also of a shooting which occurred earlier in the evening at the Continental Ballroom in which one Waters was involved.

The defendant here is being tried for the crime as set forth in the indictment, that is, the murder of Samuel Cuzzolino. What defendant's intention was with regard to Foster and Waters is not here in issue, since the defendant is not being tried for the alleged crime of shooting at either Foster or Waters; and you will in no way concern yourselves with that issue."

█ Although we find no reversible error here, we would note that the prosecutor discussed the defendant's shooting at Foster in his opening to the jury, and produced at the trial 11 witnesses, including a medical witness, as to this shooting in Freddie's Tavern. Since the evidence of the shooting was admissible only for the limited purpose of showing the defendant's malice, ill will, and killing state of mind, it was quite unnecessary to go into such an extended presentation of testimony concerning it. The State properly should have limited its proof in this regard, but, as we have stated, we do not find in the light of all the facts adduced at the trial that the defendant's fundamental rights were in any way endangered by the admission of this testimony.

The defendant next sets forth several alleged errors by the trial court in sustaining the State's objection to questions propounded of witnesses by defense counsel.

█ On the State's case the clerk of the sporting goods store testified that he had sold the defendant the second shot-

gun, and he gave details of the transaction. On cross-examination he was asked the following question to which the State's objection was sustained:

"When was the first time it occurred to you that you would have to determine whether he was drunk or sober?"

This was improper cross-examination because the witness was not questioned on direct examination as to the defendant's sobriety, *State v. Murphy*, 87 *N. J. L.* 515, 529 (*E. & A.* 1915); *State v. Centalonza*, 18 *N. J. Super.* 154, 159 (*App. Div.* 1952), nor was there any previous testimony justifying the premise that the witness had to make a determination along these lines.

■ After testifying to the consumption of about 30 drinks of whiskey that day the defendant was asked "What was going on in your head?"; "Did you feel anything in your head?"; "How did you feel? Warm, cold, neutral? Just how did you feel?"; "How did your face feel?"; "How did your head feel?"; "Were you getting any messages up here in your head?" All of these questions were objected to by the State and the objections were properly sustained by the court. Presumably these questions were asked for the purpose of showing that the defendant's mental faculties were so dulled through intoxication as to negate any premeditation to kill, despite the fact that he had stated several times that his purpose was to kill Trixie King. The rejection of this testimony did not constitute reversible error. The defendant was permitted to testify at length as to the number of taverns he had visited that day and the amount of liquor he had consumed. The question of intoxication, and thus of the defendant's ability to preconceive the idea of killing Trixie King, was solely for the jury. Moreover, these particular questions referred to his feelings when he visited the Continental Ballroom and had nothing to do with his mental condition later when he killed Trixie King in the Six Corners Tavern.

■ The defendant attacked the admissibility of his written confession on the ground that at the time he gave the state-

ment he was suffering from an extreme neurosis aggravated by excessive drinking that day. In that connection his counsel asked him, "Did you ever lose control of your physical or mental faculties and have to be taken home?," and "On these drinking sprees were you able to get home on your own power?." Objections to these questions were correctly sustained by the court, since testimony as to excessive drinking on other occasions was irrelevant.

■ Defendant also objects to the rejection of his offered testimony as to the names of persons whom Trixie King had beaten up. The court sustained the State's objection to this testimony, although stating that it would permit the defendant to testify that Trixie King had threatened him or had inflicted beatings upon other persons in the defendant's presence. Clearly testimony as to other beatings not committed in the defendant's presence would have been hearsay and of no probative value.

■ On direct examination of the defendant's wife the defense counsel asked her if she had heard the deceased threaten her husband. The court sustained the State's objection to the question. Since the witness had previously testified that she had not heard the deceased talking to her husband, the question had already been answered.

■ The defendant testified that upon entering the Six Corners Tavern he had immediately seen Trixie King, but instead of shooting him at that time he left the bar and returned almost immediately to perform the killing. Counsel then asked him why he had not shot Trixie King when he first entered the tavern, and the defendant answered:

"I felt sorry for the guy and let him slide. Then I walked outside."

Counsel then asked:

"When you felt sorry for the guy after you had two drinks did you feel sorry for him in your heart and soul, or did you feel sorry for him in your brain?"

The State's objection was sustained over defense counsel's claim that the answer would "show he was mentally unbal-

anced." We are unable to ascertain how a reply to the question would have any such evidential value. Moreover, we doubt that even a psychiatrist would understand the question; to us at least it is unintelligible.

The defendant complains of the court's action in sustaining the State's objection to this question addressed to the defendant: *

"Tell us if Trixie hadn't gone off that stool and grabbed your gun would you have killed him?"

There was no evidence that Trixie had grabbed the gun so the question assumed the existence of a fact that was not in evidence.

The defendant also alleges various errors by the trial court in rejecting his requests to charge. It is well settled, of course, that the court need not charge in the precise language of the request where the subject matter of the request is correctly and fully covered in the charge, *State v. Tansimore*, 3 *N. J.* 516, 526 (1950).

On the question of intoxication the court charged as follows:

"There is evidence in this case concerning the use by defendant, Roscus, of alcohol prior to and on the day in question. From this testimony you may find as a fact that he was under the influence of intoxicating liquors anywhere from slightly to 'really drunk,' which are the words as I recollect them as used by the witness Eley. The general presumption is that every man is normal and is possessed of ordinary faculties. The State does not have and need not assume the burden of proof that the defendant was sober. Intoxication is an affirmative defense, and the burden is upon the defendant to establish it by a fair preponderance of evidence."

"If the evidence is sufficient to satisfy you that the intoxication of the accused at the time of homicide was so great as to prostrate his faculties and render him incapable of forming the specific intent to kill, which is the essential ingredient of murder in the first degree, he is of course not guilty of murder in the first degree. In such event, he is not entitled to acquittal; and you will consider then the question of his guilt of murder in the second degree or manslaughter. * * *"

"You should carefully discriminate between that excitable condition of the mind produced by drink, which is not incapable of forming an intent but determines to act on slight provocation, and such prostra-

tion of the faculties by intoxication as puts the accused in such a state that he is incapable of forming an intention from which he shall act."

The charge correctly covered the issue.

As to the defendant's confession, which was put in evidence, the defendant claims that the court should have charged his request that "the jury should reject the alleged confession of the defendant if, upon the whole evidence, they were satisfied that it was not his voluntary act." Yet throughout the trial defense counsel admitted that the confession was given voluntarily, contending only that the defendant because of intoxication and extreme neurosis lacked the mental capacity to realize what he was signing. The court, however, gave the defendant the benefit of the following instruction, which in effect contained the elements of the request to charge:

"The question of admissibility as evidence is the province of the Court alone to determine. And the Court has admitted these statements into evidence.

The credibility and the weight to be given the confession, if any, like all other evidence after it is admitted, are for the jury alone. It is, therefore, within your province and for you to determine what weight, if any, is to be given to this alleged confession; and as to this you are the sole judges. In determining its value and weight, the jury are under a duty to consider all the evidence in the case, including that touching the voluntary or involuntary character of the confessions and occurrences and circumstances under which it is testified it was given, including, of course, the defendant's alleged intoxication and mental condition, as testified to by Dr. Chernus."

See also *State v. Foulds*, 127 *N. J. L.* 336, 339 (*E. & A.* 1941); *State v. Cole*, 136 *N. J. L.* 606, 611 (*E. & A.* 1948), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773; *State v. Bunk*, 4 *N. J.* 461, 470 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615; *State v. Vaszorich*, 13 *N. J.* 99, 110 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400.

On the question of insanity the defendant again claims that the court erred in refusing to charge his request. The court, however, dealt with the question of insanity in great

detail and properly instructed the jury on that phase of the case.

The defendant objects to the fact that on the eleventh day of the trial he was brought before the judge in a restraining belt, claiming that such procedure impaired his fundamental rights. This unorthodox procedure was necessitated by the defendant's frequent outbursts during the trial on the previous day, and his threats that he would not return to the courtroom for the balance of the trial. The defendant was kept in the restraining belt only during a brief appearance before the trial judge and it was removed prior to the appearance of the jury. Clearly the defendant's rights were not impaired.

The defendant claims reversible error because during one of the recess periods he had seen the foreman of the jury enter the judge's chambers. Shortly thereafter the judge asked counsel if they would agree to hold night sessions, so the defendant states that it is possible that this was the mission of the foreman. Assuming that this is so, it forms no basis for reversal. Moreover, no objection was made by the defendant at the trial.

It is also claimed that the trial judge erred in interrupting the sequestration of the jury. The alleged interruption occurred when a juror became ill and medical attention was necessary. After examination by a doctor it was determined that the juror would be unable to resume his duties for at least three or four days, so the juror was excused. The medical examination took place in the hotel where the jury was sequestered and counsel for both the State and the defendant consented to the examination and the excusal of the juror. There was clearly no error, and, even if one had existed, the defendant waived it by failing to enter timely objection thereto.

Lastly, defendant claims that the verdict of the jury was the result of mistake, partiality, passion and prejudice, relying solely on the fact that at the jury's request the court instructed them as to the legal effect of a recommendation of life imprisonment. The jury retired to the jury room at

2:15 P. M. At 4:15 P. M. it returned with the following request for instructions:

"Your Honor, the jury would like to know if first degree murder with a recommendation of life imprisonment under the law of this State means just that, or can he be eligible for parole after a specific time."

Accordingly the judge instructed them first that if they were to bring in a verdict of guilty of murder in the first degree with a recommendation of life imprisonment, the court must sentence the defendant to life imprisonment. Then he read and reread to them *N. J. S. A.* 30:4–123.11 regarding the power of the New Jersey State Parole Board:

"Any prisoner serving a sentence of life shall be eligible for consideration for release on parole after having served twenty-five years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments."

Defense counsel expressed complete satisfaction with the instructions, stating "I have no objection to the instructions that your Honor gave, and I think they were very good." Thus, objection to the charge was not properly raised as required under *R. R.* 3:7–7(*b*), and in addition such instruction was proper, *State v. Molnar*, 133 *N. J. L.* 327, 336 (*E. & A.* 1945).

▉ The case presents a clear example of a willful and deliberate killing. The only defense was that because of insanity and intoxication the defendant was unable to formulate the necessary intent to kill as required for first degree murder. This question of premeditation was submitted to the jury with proper instructions as to the law, and we find that its verdict was supported by the evidence.

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.