160 N.J. Super. 49 (1978)
388 A.2d 1283
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
FRANK J. CHANEY AND JOHNNIE CHANEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1978.
Decided June 6, 1978.
*53 Before Judges LORA, SEIDMAN and MILMED.
Ms. Barbara R. Lependorf, designated counsel, argued the cause for appellants (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Alan Dexter Bowman, Deputy Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. William F. Hyland, former Attorney General of New Jersey, on the brief).
The opinion of the court was delivered by SEIDMAN, J.A.D.
Frank J. Chaney[1] and his brother, Johnnie Chaney, were indicted for (1) the murder of one Alvin Gaillard, "then and there being armed with and having in their possession a certain dangerous weapon, to wit, a revolver," in violation of N.J.S.A. 2A:113-1; 2A:113-2 and 2A:151-5; (2) an assault upon one Cheryl Daniels (referred to at the trial as Cheryl Rencher) with a dangerous weapon with intent to kill, in violation of N.J.S.A. 2A:90-2 and 2A:151-5, and (3) possession of a revolver without a permit therefor (N.J.S.A. 2A:151-41). Johnnie *54 Chaney was separately charged in another count with threatening to take the life of the said Cheryl Daniels (N.J.S.A. 2A:113-8).
Both were found guilty as charged[2] at a jury trial. Motions for a judgment of acquittal or, in the alternative, for a new trial were heard and denied. Each was sentenced to life imprisonment for the murder and to a consecutive term of 5 to 10 years for committing the murder while armed; to concurrent terms of 5 to 10 years and 3 to 5 years for, respectively, the assault with intent to kill and the commission of the offense while having in his possession a firearm, and to a further concurrent term of 3 to 5 years for the unlawful possession of a weapon. Defendant Johnnie Chaney was additionally sentenced to a concurrent term of 5 to 7 years for the threat to kill.
Defendants appeal, setting forth in their brief the following contentions:
POINT I.
The trial court's refusal to grant the defendants' motion to sever the fourth count of the indictment constituted reversible error.
POINT II.
The trial court by calling Cheryl Daniels Rencher as a court witness abused its discretion, which abuse resulted in prejudice to the defendants constituting reversible error.
POINT III.
As the totality of the circumstances surrounding the eyewitness' pre-trial confrontations were unnecessarily suggestive and conducive to irreparable mistaken identification, it was error to admit both the pre-trial identification and the in-court identification.
POINT IV.
The trial court abused its discretion by permitting rebuttal testimony by a TWA representative and a stewardess.
POINT V.
It was plain error for the trial court to limit the jury to a finding of a verdict of guilty of first degree murder or an acquittal.
*55 POINT VI.
The verdict was fatally defective as it failed to specify the degree of murder of which the defendants were found guilty.
POINT VII.
The cumulative effect of trial errors deprived defendants of a fair trial under our system of justice and a new trial should be granted.
In a supplemental pro se brief "On Behalf of both Defendants," defendant Johnnie Chaney argues that "the trial court should have granted the motion for judgment [sic] of acquittal or a new trial."
Alvin Gaillard was shot to death at about 7:30 P.M. on February 22, 1974 as he left his dry cleaning store located at Ocean and Virginia Avenues in Jersey City, and was about to get into his automobile which was parked nearby. His companion, Cheryl Rencher (Daniels), was the only eyewitness known to the police. Her identification of defendants as the culprits led to their apprehension and subsequent indictment and trial.[3] Defendants denied having been implicated in the murder and related offenses. Each claimed to have been elsewhere at the time of the murder. Frank Chaney maintained that he was at the home of a friend and produced corroborating witnesses. The defense offered by Johnnie Chaney was that he had left for California two days earlier and was there when the shooting occurred.
We deal first with defendants' contention that the trial judge abused his discretion "by calling Cheryl Daniels Rencher as a court witness * * * which abuse resulted in prejudice to the defendants constituting reversible error."
Except in rebuttal, the only witness produced before the jury by the State was the county medical examiner, whose testimony related to the cause of death as determined by the autopsy he had performed on decedent's body. Over defense *56 objection, Mrs. Rencher, obviously a key witness without whom the State could not have placed defendants at the scene of the crime, was allowed to testify as a court witness on the motion of the prosecutor, who was apprehensive of her reliability as a witness. The request was made at the conclusion of a protracted preliminary inquiry held by the trial judge out of the presence of the jury to determine the admissibility of Mrs. Rencher's out-of-court and anticipated in-court identification of defendants. Mrs. Rencher was thereupon summoned as a court witness. The direct examination of the witness was conducted by the trial judge. It was followed by cross-examination by each defense attorney and the prosecutor, in that order.
Defendants complain that to their "great prejudice * * * the prosecutor was placed in a position of being able to bolster the credibility of the only eyewitness to the crime, by giving the witness the opportunity of repeating the testimony she had given when questioned by the court when again questioned by the State."
There were indeed inconsistencies and contradictions in Mrs. Rencher's testimony, and her credibility was further impaired by other witnesses produced in behalf of defendants. The most significant discrepancy related to her identification of the defendants. Her version on the voir dire (later substantially repeated to the jury) was that as she was standing on the sidewalk at the passenger door of the automobile waiting for Gaillard to unlock the door on the driver's side, a car containing three men drove up alongside, squeezing decedent between the two cars. She recognized the driver as John Chaney, having seen him on other occasions. She could not identify the person in the rear of that car. Someone called out, "Hey, Alvin," and the passenger, who was armed with a revolver, began firing at decedent. She heard one of the occupants say, "Shoot the bitch," and a shot was fired in her direction. The assailants' automobile then sped away.
*57 When Mrs. Rencher was taken to police headquarters shortly thereafter, she saw among a number of photographs on a bulletin board in the detectives' room one which she recognized to be Johnnie Chaney. She immediately told one of the detectives that it was the man who had driven the car. However, detectives testified that in a written statement given by her later that night, and in another one several days later, she said that the photograph on the bulletin board was that of the passenger who had shot decedent. Mrs. Rencher denied making such statement.
Mrs. Rencher further testified on voir dire that the police showed her another photograph which she identified as "the man that shot Alvin." She was told the photograph was of Frank Chaney. When he was brought into headquarters later that night, she again identified him as the man who had done the shooting.
Other inconsistencies related to her describing the car as an Oldsmobile whereas she had previously said it was a Plymouth; to her description of the pistol used in the shooting, and to whether she had crouched down after the firing of the first shot or after the fifth or sixth shot. Furthermore, after she denied on cross-examination ever having said that the shots were fired from the sidewalk, Johnnie Chaney's former attorney, called as a witness on his behalf, testified that during the first trial Mrs. Rencher had told him in a telephone conversation that the shooter, who looked like Frank Chaney, was on the sidewalk when the episode took place and that she had given that information to the police.
The prosecutor expressed concern over Mrs. Rencher's voir dire testimony, noting that the trial judge, while denying defendants' motion to exclude the evidence bearing upon their identification, had nevertheless found Mrs. Rencher's testimony "to be untrustworthy." He acknowledged his previous awareness of "the inconsistencies as they relate to the testimony here," and of a witness (the former defense attorney) on whose testimony "we have a case of recanting on *58 the part of Mrs. Rencher." He indicated that if he put her on the stand, he would have to "vouch for the credibility of that witness." It was his position that "we should have the right just as any other counsel has the right to cross-examine the witness to find out what the truth is. * * *"
The calling of a court witness is a matter generally within the sound discretion of the trial court. See State v. Andreano, 117 N.J. Super. 498, 502 (App. Div. 1971); Annotation, "Court's witnesses (other than expert) in criminal prosecution," 67 A.L.R.2d 538 (1959). See also, State v. Singleton, 158 N.J. Super. 517, 523 (App. Div. 1978). The exercise of that discretion should not be reversed except for an abuse thereof resulting in prejudice to the defendants. United States v. Wilson, 447 F.2d 1, 8 (9 Cir.1971).
We are somewhat doubtful of a compelling need for the trial judge to have called Mrs. Rencher as a court witness. There was no indication of any potential recantation by the witness, or that she would depart to any material extent from her anticipated testimony. Cf. State v. Singleton, supra. The feared contradictions and inconsistencies were for the most part known to the prosecutor. Actually, despite the vigorous assault upon her credibility, Mrs. Rencher remained steadfast in her assertion that defendants were in the car from which the shots were fired, and that Frank Chaney was the one who did the shooting.
Notwithstanding the foregoing, we are completely satisfied from our thorough review of the record that even if the trial judge's calling of Mrs. Rencher as a court witness constituted a mistaken exercise of discretion on his part, there was no observable prejudice to defendants.
The trial judge carefully explained to the jury his reasons for the action taken. He made known the prosecutor's reluctance to call the witness because in "certain pretrial hearings in this case there appeared several inconsistencies" in Mrs. Rencher's testimony. This portrayal of Mrs. Rencher *59 as a witness whose reliability was open to doubt was not disadvantageous to defendants. Moreover, the trial judge emphatically cautioned the jury that the calling of Mrs. Rencher as a court witness "should not cloak her with dignity or prejudice or undue emphasis on her testimony." He was, in addition, meticulously dispassionate in his questioning of the witness. Finally, we find no merit in defendants' complaint that the prosecutor was able "to bolster the credibility" of the witness by giving her the opportunity to repeat her testimony. Considering her extensive cross-examination by defense counsel, the prosecutor's interrogation of the witness was largely that which probably could have been done in any case on redirect examination.
We turn next to the troublesome contention, advanced as plain error, that the trial judge limited the jury on the first count "to a finding of a verdict of guilty of first degree murder or an acquittal."
At the close of the evidence counsel for defendant Johnnie Chaney made the following request to the trial judge:
Your Honor, after having a full and complete discussion with the defendant John Chaney, it's his understanding of the law with regard to the charges against him, we respectfully request the Court that the Court in instructing the jury that as a matter of law the only offense the defendant could be charged with, could be found guilty of, is murder in the first degree.
I respectfully submit to the Court that understanding the charge that we instruct the jury as to the charge of murder and define murder and murder in the first degree. That the Court also instruct the jury that under the factual circumstances of this case the defendant could only be found guilty of murder in the first degree. He understands the request being made.
A like submission was offered on behalf of defendant Frank Chaney.
The prosecutor objected. While agreeing that with regard to the latter "[i]t's the most reasonable inference it was murder in the first degree," he maintained, as to the other defendant, that "there's no stronger evidence of first degree *60 than second degree." After taking the matter under advisement the trial judge acceded to the request, stating that he had "determine[d] from the State's presentation of the case that this is not a second degree murder case." He said:
* * * [T]he reasonable probability is that it was a planned murder. The jury could so find. The car was driven there. It was stopped long enough to fire four, five, six, seven, eight, nine possible shots. There's testimony that with each shot he smiled indicating he knew what he was doing and wanted to do it and enjoyed doing it. The closeness and proximity of the gun and victim's body indicate a first degree attempt to take life, not merely to do bodily harm.
* * * From the facts of this case I can see only one conclusion, if the jury believes the State's version, that this was a dual operation. They knew what they were about to do and it wasn't a coincidence or by chance. There was "you're getting yours," or "Hey, Al," words to that effect. The jury heard it. It indicates a planned killing.
Although, for reasons that follow, a reversal is not mandated thereby, we are nevertheless at a loss to understand the trial judge's compliance with defendants' expressed desire in the light of the admonition enunciated in State v. Mathis, 47 N.J. 455, 466-468 (1966), and iterated in State v. Harper, 128 N.J. Super. 270 (App. Div. 1974), certif. den. 65 N.J. 574 (1974).
In Mathis defendant was convicted of first-degree murder. While there was some confusion as to whether the State planned to prove that the killing occurred during a robbery or during an attempted robbery, the State and the defense seem to have assumed that an alleged felony murder was involved and they tried the case on an "all-or-nothing" basis. Both agreed that but two verdicts were possible: (1) acquittal or (2) first-degree murder, with or without a recommendation for life imprisonment. 47 N.J. at 466. The jury was charged accordingly. Among other things, defendant contended on appeal that it was nevertheless plain error to have kept from the jury the issue of second-degree murder. Although the question of plain error was not resolved, the court said:
*61 A defendant who denies complicity does not thereby concede the criminal event was everything the State claims it was. It remains the burden of the State to satisfy the jury beyond a reasonable doubt the murder was of the character the statute denounces as murder in the first degree. If under the proof there is in fact no room for dispute as to whether the killing occurred in the perpetration or attempt to perpetrate the felony, our cases say the issue should not be left to the jury. State v. Zeller, 77 N.J.L. 619 (E. & A. 1909); State v. Giampietro, 107 N.J.L. 120, 122 (E. & A. 1930); State v. Pacheco, 38 N.J. 120, 131 (1962). The cases elsewhere hold that if, on the trial of a first-degree charge, it "appears clearly" from the evidence that the homicide was of no lower degree, the trial court "may," and some cases say "should," instruct the jury to find the defendant guilty of murder in the first degree or not guilty. 41 C.J.S. Homicide § 392, p. 209. To leave the issue of second-degree murder with the jury in such circumstances could conceivably lead to a compromise verdict. On the other hand, if the issue of second-degree murder is improperly taken from the jury, the jury might convict of first-degree or acquit a man whose guilt is of a lesser degree.
We said in State v. Sullivan, 43 N.J. 209, 245 (1964), that "Even in cases where the thesis of the State's prosecution is felony-murder, if a factual issue arises as to whether the killing was a felony or nonfelony murder, the jury must be instructed that a finding of nonfelony murder must be accompanied by a designation of first or second degree murder." * * *
Under the proof in this case the fact of a robbery or attempt to rob was not indisputable, and indeed defendant affirmatively challenged that aspect of the State's thesis. Under such circumstances the issue of second-degree murder should have gone to the jury. Having deliberately taken the all-or-nothing stance we have described, defendant is in poor position to complain. Whether we should nonetheless find there was "plain error," we need not decide since for other reasons there must be a new trial. We have however stated our view for guidance upon that retrial.
In Harper, "[t]he question left unanswered in Mathis  whether a defendant having deliberately taken an all-or-nothing stance under circumstances where the issue of second degree murder should have gone to the jury can urge this as plain error or appeal * * * [was] squarely presented." 128 N.J. Super. at 276. Defendant in Harper was tried to a jury on an indictment charging him with armed robbery and murder. At the close of the State's case, defense counsel *62 moved unsuccessfully for a dismissal on the ground that the evidence failed to conform to the indictment in that there was no proof of the underlying felony which could be tied to the defendant. Both counsel then agreed with the judge that there could be but two verdicts  not guilty or felony murder. The jury found defendant guilty of felony murder. This was urged on appeal as plain error.
We emphasized in Harper that despite the very strong evidence of felony murder, it was a mistake for the trial judge to have acceded to the defendant's position that the case go to the jury without the second degree murder alternative. We said that the choice should not have been withheld from the jury regardless of the wishes of counsel. 128 N.J. Super. at 279.
But on the effect of such error, we stated initially that
[t]rial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. State v. Pontery, 19 N.J. 457 (1955); State v. Roscus, 16 N.J. 415 (1954); State v. Auld, 2 N.J. 426 (1949), aff'd on petition for habeas corpus 187 F. 2d 615 (3 Cir.1951). "The defendant cannot beseech and request the trial court to take a course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." State v. Pontery, supra 19 N.J. at 471; * * * [additional citations omitted.] [128 N.J. Super. at 277]
We added, however, that it did not follow that a reversal was automatically foreclosed because the error was occasioned by the intentional or purposeful acts of defense counsel. We said:
* * * In those cases in which such induced or invited error was not permitted to be pressed on appeal, it appears that the particular error did not cut mortally into the substantive rights of the defendant. Thus, where the invited error did not demonstrably impair a defendant's ability to maintain a defense on the merits * * * or where the after-critizied judicial action was reasonably thought to secure a trial or tactical advantage for the defendant * * *, it has not been considered so egregious as to mandate a reversal on appeal.
*63 We must recognize, however, that, although brought about by defendant, there are errors of such magnitude that they trench directly upon the proper discharge of the judicial function. Some errors "may go so plainly to the integrity of the proceedings that * * * a new trial is the just course. * * *." State v. Macon [57 N.J. 325, 338 (1971)]. We conceive that errors of this dimension may be cognizable on appeal as plain error notwithstanding their having been precipitated by a defendant at the trial level. [128 N.J. Super. at 277-278]
Harper succinctly formulates the inquiry to be made in such situations in order to determine whether the omission of instructions on second-degree murder necessitates a reversal: It entails "a close, balancing examination of the nature of the error, its impact on the trial and the jury's verdict, and the quality of defendant's motives and conduct in bringing about the error." 128 N.J. Super. at 278.
The situation here is unlike that in Mathis and Harper, where all concerned were in agreement, though mistakenly, that the case should go to the jury exclusively on a felony murder theory, which, if resolved adversely to defendant, could lead only to a verdict of guilty of murder in the first degree.
Felony murder was clearly not involved in this case. Yet we do not suppose that defendants were uninformed of the presumption of second degree murder in the event an unlawful homicide was established, State v. Bess, 53 N.J. 10, 17 (1968), or of the obligation of the State to prove beyond a reasonable doubt the additional elements needed to elevate the offense to first-degree murder, namely, that the killing was willful, deliberate and premeditated. State v. Gardner, 51 N.J. 444, 457 (1968). Insofar as the first count is concerned, we have no doubt whatever that defendants, with full awareness of the possible consequence, freely took the calculated risk of going to the jury on an all-or-nothing basis. Evidently fearful in the face of the disputed alibi defense that the inclusion in the charge of the usual instructions on second degree murder might tempt the jury to compromise on a second degree verdict, whereas, if confronted *64 with the limited choice of either guilty or not guilty of first degree murder, the jury might opt for an acquittal, defendants gambled on the latter. Their strategy having failed, defendants now urge us to extricate them from a predicament of their own making. Bearing in mind defendants' motive in pressing upon the trial judge the very cause of action of which they now complain, we look with disfavor upon this plea.
Moreover, on the facts here present, even assuming that the issue of second degree murder had been submitted to the jury, it is very unlikely that any verdict other than murder in the first degree would have been returned, once the jury rejected the alibi defense and placed defendants at the scene of the crime.
The shooting here bore all the earmarks of a deliberately planned execution. It is noteworthy that even the testimony of a purported eyewitness called by the defense points to the same conclusion. The witness, who had known defendants for a number of years and who claimed to have been at the scene of the shooting, stated that she saw two men, one white and the other black, in a black car parked directly in front of decedent's store. She said that the black man got out of the car and stood on the sidewalk, and that when decedent came out of the store and walked toward his car, the black man shot him. According to the witness, defendants were not involved in the incident. She explained her failure to identify herself to the police by professing fear of the murderer, who was "looking right in my face."
Beyond the foregoing, it is entirely clear, in view of defendants' total reliance upon their alibi defense, that the "invited error did not demonstrably impair [their] ability to maintain a defense on the merits." State v. Harper, supra, 128 N.J. Super. at 277.
We are completely satisfied from our "close, balancing examination of the nature of the error, its impact on the trial and the jury's verdict, and the quality of defendant's *65 motives and conduct in bringing about the error" (128 N.J. Super. at 278), that the error "was not of such patent gravity as to require a new trial." Id. In the context of this case, it was not of such nature as to have been clearly capable of producing an unjust result. R. 2:10-2. A reversal of the judgment of conviction on the ground here urged by defendants would be a perversion of justice.
The conclusion we have reached also effectively disposes of defendants' further contention (not raised below) that "the verdict was fatally defective as it failed to specify the degree of murder of which the defendants were found guilty."
The remaining points raised by defendants do not require extended comment.
Defendants contend that the trial judge abused his discretion in denying their pretrial motion to sever for separate trial the fourth count of the indictment, which charged Johnnie Chaney alone with threatening to take the life of Cheryl Rencher. Frank Chaney argued that since the alleged threat was that "he [Johnnie] and his brother" would shoot Mrs. Rencher if she testified against them, a finding by the jury that such threat had in fact been made would tend to implicate him in the shooting of decedent. He maintained that he would be severely prejudiced thereby. Johnnie Chaney's position was that the joinder was prejudicial as to him because the offense charged in the count was not of the same character nor based upon the same alleged act or acts as those involved in the other counts.
R. 3:7-6 permits the inclusion of two or more offenses in the same indictment, provided they are of the same or similar character or are based on the same act or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Similarly, under R. 3:7-7, two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be *66 charged in one or more counts together or separately and all need not be charged in each count.
The joinder of the fourth count presents no problem insofar as Johnnie Chaney is concerned. The threat, allegedly directed to a material witness to the murder, was, if true, clearly connected to the murder and could be construed as an effort on his part to avoid conviction. The relationship between the two offenses fits squarely within the contemplation of R. 3:7-6; consequently, the trial judge correctly denied the motion for severance made by that defendant.
As to Frank Chaney, it is to be noted that in matters of severance a "wide range of discretion necessarily reposes in the trial judge." State v. Sinclair, 49 N.J. 525, 550 (1967). As we have said, the alleged threat was related to the murder, and this would be so irrespective of Frank Chaney's lack of participation therein. The fact that some evidence would be admissible at trial only as to one defendant presents nothing novel. State v. Manney, 26 N.J. 362, 369 (1958). While any joinder of offenses or defendants has some potential for harm, we see no basis for a reasonable apprehension of prejudice here, since any possible harm could be, and in this case was, completely dissipated by appropriate instructions to the jury. We have no reason to believe that the jury disregarded those instructions. The denial of this defendant's motion for a severance did not amount to a mistaken exercise of discretion on the part of the trial judge.
As for the contention that the out-of-court identification of Frank Chaney by Mrs. Rencher was the result of impermissibly suggestive police procedures, thereby rendering inadmissible any testimony as to such identification and also tainting her in-court identification of that defendant, we are in accord wth the trial judge's contrary determination at the close of the preliminary hearing on the issue. We are satisfied from our independent evaluation of the proofs, applying the criteria set forth in Neil v. Biggers, 409 U.S. *67 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), that the procedures did not give rise to "a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed. 1247 (1968). We observe, moreover, that much of defendants' argument relates to the credibility of and weight to be given Mrs. Rencher's identification testimony, which were the concern of the jury, and not to its admissibility.
We discern no merit in defendants' further contention that the trial judge abused discretion in "permitting testimony by a TWA representative and a stewardess." As we have indicated, Johnnie Chaney maintained that he had left for California on February 20, 1974, and witnesses were produced who stated they had accompanied him to the airport on the afternoon of that day, although they did not actually see him board a plane. He further claimed that he did not return until February 24. Another witness, who resided in San Francisco, said that defendant was there until she drove him to the airport of that city on February 23.
A Trans World Airline stewardess assigned to a flight which departed from John F. Kennedy for San Francisco at 7:45 P.M. on February 20, testified in rebuttal after Johnnie Chaney's attorney was ordered by the judge to produce and turn over to the prosecutor a TWA ticket for the flight in question in that defendant's possession which contained the name of a "Mr. Chaney." She stated that she noticed only one black man on board. She identified a person seated in the courtroom as the one who had been aboard the plane. It was Ronnie Chaney, Johnnie Chaney's twin brother.
The argument advanced is that the testimony presented by the State "did not in anyway rebutt [sic] that defense [Johnnie Chaney's being in California at the time] but merely raised collateral and irrelevant issues, i.e., that Ronnie Chaney took a flight to California at approximately the same time as Johnnie supposedly had." The argument is *68 manifestly specious. The testimony, if believed by the jury, would clearly tend to refute Johnnie Chaney's alibi defense.
Defendants assert next that "the cumulative effect of trial errors" deprived them of a fair trial. In addition to the foregoing assignments of error, they complain of allegedly improper prosecutorial comments and of the manner in which the trial judge questioned two witnesses. As to these matters, we take note of appellants' failure to comply with the requirement of R. 2:6-2(e) that the legal argument in the brief be divided, under appropriate point headings, into as many parts as there are points to be argued.
In any event, as to the claimed transgressions by the prosecutor during his summation, our careful review of the record in this regard has not disclosed any remark which so exceeded the bounds of propriety as to have warranted the granting of defendants' motion below for a mistrial or to require corrective action by us on this appeal.
Defendants charge that in his questioning of the witness Renee Crawford, the trial judge "divested [himself] of judicial partiality and conducted a cross-examination of the witness which unduly prejudiced the defendants." Reference is also made to "certain facial expressions" by the trial judge which are not further described either in the transcript or in the brief. As to the witness Clarissa Mathis, it is asserted that "the Court questioned the witness in such a way as to have one counsel at side bar comment on the tone of voice used by the Court as he felt the judge was badgering the witness."
It is well settled that a trial judge has the power and often the duty to intervene in the questioning of a witness. State v. Laws, 50 N.J. 159, 181 (1967). Where he deems it necessary he may question a witness in order to clarify existing testimony or to elicit further information. Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 132 (1958). However, such participation must be balanced by the necessity for self-restraint and the maintenance of an atmosphere *69 of impartiality. State v. Ray, 43 N.J. 19, 25 (1964). He must be careful not to throw his judicial weight on the side of either the State or the defendant, nor may he cross the line that separates advocacy from impartiality. Id.
It is a fact that the trial judge questioned the witness Renee Crawford at some length, but we do not believe that the intervention was excessive.
Miss Crawford testified that Frank Chaney had been at her apartment from 7 P.M. on the night in question until about 8:45 P.M. She said the police came to her apartment at 10:30 or 11 P.M., as she was preparing to go out, and inquired about the two brothers, without giving any reason therefor. She told them Johnnie was away and that Frank had been there earlier but had left. The witness stated further that shortly thereafter she met Frank's niece, who told her that he had been picked up by the police for "something that happened that night." At one point she said that between midnight and 1 A.M., upon receiving this information, she went to the police precinct, accompanied by Frank's mother and a friend, and informed the police that Frank had been at her home at the time of the crime. But at another point in her testimony she said that when she reached the precinct house she inquired about Frank at the front desk and left when she was told he was not there.
There was also some uncertainty as when the telephone calls were made that night to Johnnie Chaney. She stated that on the "night it happened," or early that morning, "[w]e called him in California and told him, you know, that the police were looking for him." She added that "my mother called him for me and I talked to him later on that day."
A reading of the trial judge's interrogation indicates clearly that essentially he was seeking to clarify when the telephone calls were made and also, in view of the conflict in her testimony, whether the witness had in fact told the police that Frank Chaney had been at her residence at the time of the murder. We detect nothing in the questioning which suggested any doubt on the trial judge's part as to *70 her credibility. As for his "facial expressions," we have no way of determining from the cold record what they were or whether, if made, they had "an unduly prejudicial effect upon the jury." We note that counsel voiced no complaint until the morning session following the witness' testimony, at which time a mistrial was sought by Frank Chaney's attorney, who said his comments "were directed toward the manner in which the questions were asked and the unintended expressions, facial expressions of the Court when the witness responded." The trial judge offered to correct by an appropriate instruction whatever adverse impression, if any, the jury might have formed, but the offer was declined. In any event, the trial judge correctly instructed the jury at the close of the case that they alone had the power and the duty to evaluate the credibility of each and every witness. He emphasized that his questioning of witnesses was "not to be taken by you that I was trying to help or hurt one side or the other," and that "any gesture or emphasis or facial expression or change of volume of voice or tone" was done inadvertently and not "to convey to you my acceptance or rejection of the evidence." Cf. State v. Johnson, 159 N.J. Super. 26 (App. Div. 1978). These instructions "set forth all of the protective principles to to which the defendants were entitled." State v. Laws, supra at 181. We are satisfied that the trial judge's intrusion "in the taking of testimony did not impair the fairness of the trial or the justness of the verdicts." Id.
We reach a like result with respect to the trial judge's questioning of Clarissa Mathis. We find nothing therein to support counsel's allegation that the witness was being "badgered."
Finally, Johnnie Chaney's pro se contention that the trial judge should have granted the motions for a judgment of acquittal or a new trial is clearly without merit. R. 2:11-3 (e)(2).
The judgments of conviction are affirmed.
NOTES
[1] Named in the indictment as Frank James Chaney.
[2] It will appear later herein that at defendants' request the jury was instructed on the murder count only with respect to first degree murder.
[3] It is to be noted that a previous trial of the indictment was terminated by the declaration of a mistrial when it developed that the defense attorney, who then represented Johnnie Chaney, might have to be called as a defense witness.