THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARVIN R. MATHIS, DEFENDANT-APPELLANT.

Argued April 4, 1966—Decided July 6, 1966.

456

*Mr. Robert P. McDonough* argued the cause for appellant.

*Mr. Leo Kaplowitz,* Union County Prosecutor, argued the cause for respondent (*Mr. Raymond S. Londa,* Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of murder in the first degree, and the jury not having recommended life imprisonment, he was sentenced to die. He appeals directly to this Court. *R. R.* 1:2–1(c).

The deceased, Stanley Caswell, had an insurance debit route which took him to North Ninth Street in Kenilworth. The residents there knew him as "the insurance man."

There are two houses at 218–220 North Ninth Street, one behind the other. Defendant's father occupied an apartment in the rear house. On February 12, 1965 Mr. Caswell was at the premises. Defendant too was there, to see his father on some matter. One State's witness placed defendant outside the house at about 6:00 P. M. on a course on which defendant and Mr. Caswell would have met. Moments later, one occupant heard two reports, like those of exploding firecrackers.

James Faines, who also lived at 220 North Ninth Street, testified that he and his friend, Lewis Clark, were working in the driveway on Faines' automobile; that he saw defendant pushing a man into the back seat of a red Renault which belonged to the insurance man; that he looked into the car and saw that it was the insurance man; that blood was coming from the victim's forehead and he was moaning; and that defendant struck Faines with his arm, saying "Get away from here, boy." Faines left, remarking to Clark that "It looks like Marvin was rolling the guy." Clark testified substantially to the same effect, although he did not look into the Renault and could not say who the victim was.

The testimony shows the Renault was then driven a short distance to a wooded area; that two further shots were fired; and the car then set afire. When the blaze was extinguished, the badly charred body of the deceased was found.

The autopsy revealed that death was due to four shots fired from a .22 caliber gun. There was testimony that late on the day of the murder or early the next morning, defendant tried to sell a small gun and a box of shells.

Defendant admitted being at his father's home at the time of the murder, but denied all knowledge of it. He said he did not know Mr. Caswell and did not see the red Renault. He denied trying to sell a gun. He said that on the 13th, the day after the crime, he heard his wife was in police custody and that he was wanted as a "material witness." He said his brother-in-law advised him to lose himself in Harlem for a while, in the hope that the culprit would meanwhile be found, and this because defendant had a criminal record. Defendant did go to New York City, but on the 15th he called the F. B. I., identified himself, and was taken into custody.

## I.

The first issue arises from some confusion over the State's theory. The indictment is in the short form prescribed by R. R. 3:4-3(c). Defendant demanded a bill of particulars designating the type of homicide the State planned to prove.

The State specified a killing during an *attempt* at robbery. Why the State so limited itself is a mystery.

The State in fact offered proof of the completed crime of robbery. Thus Mrs. Caswell testified the deceased wore a wristwatch, a wedding ring, and a Masonic lapel pin, none of which were recovered. Mr. Brady, a chemist, testified that his analysis of the charred remnants revealed no evidence of gold beyond that usually found in ordinary dirt or debris. There was no direct proof of the loss of money, for the deceased had apparently secreted his wallet in the car where it was found by the police, and some change, totaling less than two dollars, was still in his trousers. But the debit book was found, and an audit of it indicated a shortage of $3.93. There was also testimony that the right rear pocket of deceased's trousers was turned inside out.

The defense did not object to evidence indicative of a completed robbery. The reason apparently was that the defense conceived that proof of a completed robbery would foreclose a claim of an *attempt* to rob and thus lead to an acquittal. When the trial court rejected that view and the State sought to amend the bill of particulars to add "robbery," defense counsel objected, saying he had not cross-examined the several witnesses with respect to the items allegedly missing, because, as we have said, the defense concerned itself only with an "attempt." The trial court permitted robbery to be added by amendment, but then required the State to "elect" between robbery and an attempt. The State chose to pursue the theory of a consummated robbery, but when the defense insisted that it had been misled by the original bill of particulars, the State returned to the theory of an attempt to rob. Still the defense was not content, because when it lost its quest for an acquittal on the ground that the robbery had been completed, it found itself facing incriminating evidence it had thought would be helpful. So the defense moved to strike all the evidence with respect to the missing items. The trial court granted that motion, leaving in the case only testimony that the trouser pocket was turned inside out.

Although the State thus reverted to its initial theme and the trial court struck out evidence of an accomplished robbery, the defense now complains of the introduction of that evidence. It says that the State's claim of an "attempt" led it not to object to the evidence, and that striking it from the record and admonishing the jury to disregard it did not right the wrong.

 The statute makes several kinds of homicide murder in the first degree. *N. J. S.* 2A:113–2. Included are a killing "committed in perpetrating or attempting to perpetrate * * * robbery." The State may pursue as many theses as the evidence will support. So here the State could have alleged in the bill of particulars: (1) a killing in the perpetration of robbery; (2) a killing in an attempt to perpetrate robbery; and (3), a "willful, deliberate and premeditated killing," especially in the light of the proof that two additional shots were fired into the decedent just before the auto was set afire, suggesting he was then still alive. *State v. Butler,* 27 *N. J.* 560, 590 (1958).

 The notion that the State must select a single thesis is wholly without warrant. As we have said, any thesis fairly supported in the evidence goes to the jury. In pressing for an "election," the defense misread *State v. Butler, supra,* 27 *N. J.,* at *p.* 589, where we said:

"* * * In the course of the argument of the motions for a judgment of acquittal at the close of the State's case, defense counsel requested that a designation be made as to whether the charge was robbery-murder or burglary-murder because both terms had been used. The prosecutor replied:

'We rely on both. We leave it to the Court's decision on the basis of the record so far.'

The court then denied a motion to eliminate the element of burglary from the case. At this point, either the motion should have been granted or, in any event, the court should have required the State to specify the theory of its case."

In requiring the State to "specify" its theory, we did not mean it had to "elect" from among permissible ones. Rather our

criticism was directed at the failure of the prosecutor himself to state his theory, for the prosecutor there simply committed to the trial court the prosecutor's responsibility to decide what was the thesis of the prosecution.

Hence, here, had the State initially charged both robbery and an attempt to rob, there would have been no basis whatever to require an election. *State v. Smith,* 32 *N. J.* 501, 522 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961). Nor, after the bill of particulars was amended to that effect, was an election called for. Rather the question was whether the defense had been misled by the original specification of an "attempt" alone.

██ We think it clear the defense was misled by its own misconception of the law rather than by the State's bill of particulars. Starting with the proposition that a failure to consummate the crime is an essential ingredient of an "attempt" to commit it, see definition in *State v. Swan,* 131 *N. J. L.* 67, 69 (*E. & A.* 1943), the defense concluded it must follow that if the plan to rob succeeded, there was no "attempt" and hence no killing during an "attempt." The cases on the point are not many, and surprisingly some do bar a conviction for an "attempt" when the proof shows the attempt succeeded. See 1 *Burdick, Law of Crime* (1946), § 147, *p.* 193; 22 *C. J. S. Criminal Law* §74, *p.* 227. We can understand that there may be situations in which a jury finding of an "attempt" is palpably a compromise verdict, but we see no sensible end to be served by the bald proposition that when the State alleges only an "attempt," there must be an acquittal if the evidence shows the defendant went further than the State charged. Surely an "attempt" is not so divorced from the completed crime that the charge of one gives no suggestion of the other. It has long been the rule in our State, first by statute, *R. S.* 2 :190–11; *State v. Schwarzbach,* 84 *N. J. L.* 268, 270 (*E. & A.* 1913), and now by rule of court, *R. R.* 3 :7–9, that upon a prosecution for a crime, the defendant may be convicted of an attempt to commit it.

■ In any event, none of the cases relied upon by defendant dealt with a felony murder, and in that area there is even less warrant to speak of the niceties of robbery and an attempt to rob. Common to both is the felonious intent to rob, and it is that intent which serves as a substitute for the malicious intent which otherwise would be required for murder in the first degree. *Cf.* 1 *Warren, Homicide* (*Perm ed.* 1938), § 74, *p.* 325; 26 *Am. Jur., Homicide,* § 309, *p.* 363. To put it another way, the charge here is not an attempt to murder, but rather the completed crime of murder, and we look to the robbery phase to find an additional fact which bears upon the degree or nature of the murder. Far from differentiating between a perpetration of the robbery and an attempt to perpetrate, the Legislature made it plain that, whichever it was, the murder would be in the first degree. In this setting, it would yield nothing but technical delight to say that, although a completed murder is charged, the State will founder if perchance it alleges the robbery was incomplete when in fact the attempt to rob had succeeded.

The situation here is the factual converse of that presented in *State v. La Pierre,* 39 *N. J.* 156, *cert.* denied 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed.* 2d 1073 (1963), where the homicide was charged to have been committed in the course of a robbery and the State proved only an attempt, there being no evidence that anything was taken. We said (at *p.* 174) :

"* * * Bisignano demanded particulars, in response to which the State said the killing was 'a felony murder, specifically a murder in the course of a robbery.' The complaint is that the State proved only an *attempt* to rob, since it did not prove that anything was taken. While acknowledging that a killing in an attempt to rob is equally murder in the first degree, defendant nonetheless claims a fatal variance.

It is perfectly obvious that defendant was not misled. The examination of the prospective jurors reveals that all defendants knew precisely what was involved."

■ We think it equally clear that the defense here knew what it had to meet. As we have said, the defense was misled,

not by the State's error in its bill of particulars, but rather by the defense's misconception that a killing in the perpetration of a robbery is so distant from a killing in an attempt to perpetrate a robbery, that the proof of a completed robbery would somehow absolve the accused. It was for that reason that defendant did not oppose proof that articles of value were missing. He can hardly complain that he failed to object to that proof because he misconceived its legal significance. The trial court did more than it had to when it later struck that evidence.

This is not to say that a specification of an attempt to perpetrate a robbery could not mislead a defendant. Obviously the preparation, and the conduct of the case, may be different, if the defense understands that the State will seek to bolster its charge of a felony killing with evidence that something in fact was taken from the victim. We said at the outset that we could not fathom why the State confined itself to a charge of an attempt to rob. The bill of particulars should have alleged both the perpetration and an attempt to perpetrate a robbery, and in connection with the retrial we must order for other reasons given hereinafter, the State should promptly amend its bill of particulars.

## II.

Defendant says an acquittal should have been directed for lack of evidence and alternatively that the conviction was against the weight of the evidence. Defendant does not question the sufficiency of the proof to show he was the killer. The evidence is ample to that end. Rather defendant says the State proved no more than murder in the second degree and hence, since only first-degree murder was claimed in the State's bill of particulars, the verdict cannot stand.

The principal basis for defendant's claim is the proposition we rejected in "I" above, that the evidence showed the attempt to rob in fact succeeded and hence there could not have been an "attempt," the felonious activity specified in the bill

of particulars. For the reasons already given, the point is frivolous.

The other reason why defendant says the State failed to prove a killing in the course of an attempt (or a robbery) is that conceivably defendant did not entertain a purpose to steal until after committing the homicide for some unrelated reason. *Cf. State v. Swan, supra,* 131 *N. J. L.,* at *p.* 69. There is no evidence to support that hypothesis, and if, as the argument assumes for immediate purposes, there was an intent to rob, it is fair to infer that that purpose was indeed the original motivation. The probabilities abound that way.

It is not clear whether defendant contends also that there was no evidence of an attempt to rob after the court struck the testimony as to the missing articles. If defendant does so contend, the answer is that the proof remained that a pants pocket was turned inside out. That fact, plus the fact that defendant was known to be a collector of insurance premiums and the fact that defendant and deceased had no prior relations suggestive of another motivation, suffice. Whether that proof was so unequivocal as to foreclose the possibility of a murder in the second degree is a different question, to which we will now turn.

### III.

Both the State and the defense tried the case on an all-or-nothing basis. Both agreed that but two verdicts were possible: (1) acquittal or (2) first-degree murder, with or without a recommendation for life imprisonment. Now defendant claims it was plain error to have kept from the jury the issue of second-degree murder.

An unlawful homicide is murder in the second degree. It is incumbent upon the State to prove the additional element the statute, *N. J. S.* 2A:113-2, requires to elevate the offense to first degree, and on the thesis on which this case was tried, that additional element was an attempt to rob.

Here there was no evidence affirmatively suggesting the killing was other than in the course of an attempt to rob.

Still the question remains whether the State's proof as to an attempt to rob was so unequivocal as to make it idle to ask the jury to pass upon it. After the testimony concerning the missing articles was struck, there remained the fact that a trouser pocket was turned inside out, but the defense contended that this circumstance, without more, did not show the pocket was turned by the assailant. Thus the defense denied that that fact necessarily suggested a robbery.

A defendant who denies complicity does not thereby concede the criminal event was everything the State claims it was. It remains the burden of the State to satisfy the jury beyond a reasonable doubt that the murder was of the character the statute denounces as murder in the first degree. If under the proof there is in fact no room for dispute as to whether the killing occurred in the perpetration or attempt to perpetrate the felony, our cases say the issue should not be left to the jury. *State v. Zeller,* 77 *N. J. L.* 619 (*E. & A.* 1909); *State v. Giampietro,* 107 *N. J. L.* 120, 122 (*E. & A.* 1930); *State v. Pacheco,* 38 *N. J.* 120, 131 (1962). The cases elsewhere hold that if, on the trial of a first-degree charge, it "appears clearly" from the evidence that the homicide was of no lower degree, the trial court "may," and some cases say "should," instruct the jury to find the defendant guilty of murder in the first degree or not guilty. 41 *C. J. S. Homicide* § 392, *p.* 209. To leave the issue of second-degree murder with the jury in such circumstances could conceivably lead to a compromise verdict. On the other hand, if the issue of second-degree murder is improperly taken from the jury, the jury might convict of first-degree or acquit a man whose guilt is of a lesser degree.

We said in *State v. Sullivan,* 43 *N. J.* 209, 245 (1964), that "Even in cases where the thesis of the State's prosecution is felony-murder, if a factual issue arises as to whether the killing was a felony or nonfelony murder, the jury must be instructed that a finding of nonfelony killing must be accompanied by a designation of first or second degree murder." A factual issue of that kind was involved in *State v. Wynn,* 21

*N. J.* 264 (1956), and it was held to be error not to leave second-degree murder with the jury.

 Under the proof in this case the fact of a robbery or attempt to rob was not indisputable, and indeed defendant affirmatively challenged that aspect of the State's thesis. Under such circumstances the issue of second-degree murder should have gone to the jury. Having deliberately taken the all-or-nothing stance we have described, defendant is in poor position to complain. Whether we should nonetheless find there was "plain error," we need not decide since for other reasons there must be a new trial. We however have stated our view for guidance upon that retrial.

## IV.

 It will be recalled that Faines testified that he saw defendant pushing the deceased into the Renault and that Clark was with him at the time. Clark testified to like effect except that he did not look into the car. Neither Faines nor Clark called the police despite the gravity of the crime they witnessed. On cross-examination, Clark testified there were four criminal charges pending against him. That examination was proper upon the question whether Clark was hoping for favorable treatment in exchange for his testimony. *State v. Curcio,* 23 *N. J.* 521, 527 (1957); *Slate v. Sullivan, supra,* 43 *N. J.,* at *pp.* 235–236. Defendant wanted also to bring out "the nature of the charges pending against" him. The State objected, and the trial court sustained the objection. The defense then sought to prove that Clark had confessed to armed robbery and attempted armed robbery, and the State successfully resisted that effort.

The defense did not suggest that Faines or Clark or both were the perpetrators of this murder although of course the defense was free so to contend. Before us the defense goes no further than to say "It is also true that if the defendant did not commit this crime, Faines or Clark may have and now point to defendant out of motives of self-interest or

bias." Of course if defendant so contended, he could not prove that Clark had a propensity for crime, just as the State could not have inquired into defendant's prior criminal affairs for that purpose. But defendant was entitled to bring out the nature of Clark's alleged offenses, so that the jury would know their gravity and assess Clark's hope of reward in that light. Hence, although the trial court correctly said the offenses could not be identified in order to implicate Clark in the murder of the deceased, still the seriousness of the witness's involvements was provable, to the end we have stated, with cautionary instructions, if needed, to tell the jury that the nature of the pending charges cannot be taken to evidence either a criminal bent on the part of Clark or Clark's guilt of the murder for which defendant was on trial. The testimony of Faines and Clark was damning, the most eloquent part of the State's case. In that light, we are constrained to hold that the refusal to permit defendant to prove the nature of charges pending against Clark was reversible error.

## V.

The prosecutor cross-examined defendant as to how much money he had and when he last worked. The examination suggested strongly that the State might be urging that defendant was in financial need, and hence was likely to commit a robbery. The trial court interrupted to say it would not permit proof of a financial need, unless the State was in a position to show also that things of value were stolen and that thereafter the defendant was affluent. *Cf. State v. Schuck,* 96 *N. J. L.* 154 (*E. & A.* 1921). This the State could not do.

Prior to that ruling the prosecutor had asked defendant when he last worked and in response defendant said he had from time to time assisted his father in the repair of automobiles at his father's home. The prosecutor wished to pursue that matter, and in order to take it outside the trial court's ban against inquiry into financial need, the prosecutor said his inquiry was directed solely at "credibility," that the inquiry

"* * * was intended for purposes of testing the validity of the defendant's testimony and his credibility in that, if I recall correctly, he said that he never saw the insurance man, for one thing. Now, if he was working with any degree of regularity at 220 North Ninth Street, he may have seen the insurance man on one or more occasions. That is an element of testing the credibility of this witness. And also the other element that may arise out of such testimony involving pure and simple credibility."

The court permitted the inquiry on "your representation that the question goes to the credibility of the defendant and is not a part of a designed attempt to picture as one critically in need of funds." The prosecutor then drew from defendant a statement of the number of times he had worked with his father on the repair of automobiles.

If the State's purpose remained only to show defendant was there with such frequency as to make it likely he knew the deceased, defendant's testimony that he was thus at his father's home would not have been challenged. But the State proceeded to call two neighbors of the father to testify they never saw defendant working there; and in summation the prosecutor asked why defendant had not called his father or his sister-in-law, who also lived there, to support his testimony. Thus instead of proving defendant was at the premises, the State in essence undertook to prove that he was not. The State was no longer trying to show that defendant visited his father's home so often that he probably knew the deceased. Rather the State's rebuttal testimony had to mean that defendant lied when he said he had worked with his father, *ergo,* his financial needs must have been met in some other way.

The State says, however, that despite its seeming change of direction, it was still pursuing a matter of "credibility" and nothing more. If we understand the State, it says that it may cross-examine a defendant upon any topic, wholly unrelated to any issue in the case, and then rebut his answer, thus to enable the jury to decide whether the defendant is a believable witness. We know of no rule permitting the pursuit of a collateral or extraneous issue as some sort of a trial run

upon credibility. On the contrary, if a collateral inquiry is pursued upon cross-examination, the answer given may not be disputed by extrinsic evidence unless such extrinsic evidence would be independently admissible upon a substantive issue in the case. In other words, if the testimony elicited on cross-examination is not relevant upon the issues in the case, or directly upon the witness's truthworthiness, *i. e.,* his knowledge, interest, bias, or criminal record, his answer must be accepted, lest the trial become the pursuit of sundry extraneous and distracting subjects which, to boot, the parties are probably unprepared to litigate. See *State v. Hatch,* 21 *N. J. Super.* 394 *(App. Div.* 1952); *State v. Schuler,* 28 *N. J. Super.* 275 *(App. Div.* 1953); *McCormick, Evidence* (1954), § 47, *pp.* 100–101; 3 *Wharton, Criminal Evidence* (1955), § 943, *pp.* 380–381.

Whether defendant did or did not work with his father was of course not an issue in the case. Nor would it directly bear upon credibility, for surely there is nothing about working with one's father, or not working with one's father, which suggests a man cannot be a truthworthy witness. Thus the rebuttal evidence was not germane to the case, either with respect to the triable issues or as to defendant's reliability as a witness. His testimony therefore could not be contradicted. If no more were involved than an infraction of the rules relating to collateral issues, the irregularity might be of no moment. But what emerged was something more than a mere trial of something extraneous. The point the State in truth made by its rebuttal witnesses was that defendant lied when he said he worked for his father, and hence he did not earn money that way, and being otherwise essentially unemployed, he must have been destitute and therefore he likely would rob. Thus, in ultimate effect, the State made the very point which the trial court said was impermissible.

Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many. As said in 2 *Wigmore, Evidence* (3d ed. 1940), § 392, *p.* 341:

"The *lack of money* by A might be relevant enough to show the probability of A's desiring to *commit a crime* in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence."

The relationship between the deceased and defendant of creditor and debtor may be competent as to motive, see *State v. Rogers*, 19 *N. J.* 218 (1955), but, in general terms, there must be something more than poverty to tie a defendant into a criminal milieu. Hence we are satisfied the trial court was correct in its approach to this subject. The State, however, transgressed that ruling when by its cross-examination of defendant and its rebuttal testimony it again projected before the jury the forbidden theme that defendant had no apparent means of income and hence was likely to commit a crime for dollar gain. This was improper and injurious.

The judgment is reversed and the matter remanded for a new trial.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO — 6.

*For affirmance* — None.