**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4993-14T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WALLACE L. PARRISH, a/k/a
WALI, WAWA and QUASHAWN T. BETHEA,

    Defendant-Appellant.

_____

Submitted September 12, 2017 — Decided July 24, 2018

Before Judges Carroll and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Union County, Indictment No.
11-04-0373.

Joseph E. Krakora, Public Defender, attorney
for appellant (Frank M. Gennaro, Designated
Counsel, on the brief).

Grace H. Park, Acting Union County Prosecutor,
attorney for respondent (Milton S. Leibowitz,
Special Deputy Attorney General/Acting
Assistant Prosecutor, of counsel and on the
brief).

PER CURIAM

Defendant Wallace L. Parrish appeals his June 19, 2015 judgment of conviction for felony murder, robbery, conspiracy to commit robbery, and unlawful possession of a handgun. We affirm.

I.

The trial record includes the following facts. On September 28, 2010, at 4:02 a.m., Jimmy Morel, working as a dispatcher and driver for United Taxi, received a blocked call from a man requesting a cab at an address on West Sixth Street in Plainfield.[1] The call came from a cellphone number later determined to be assigned to defendant's cousin K.M., who testified he lent the cellphone to defendant.

Morel dispatched one of his taxi drivers, Jose Gomez, to pick up the man. Gomez arrived at the location for the fare, and saw a man. As the man started to get into the back seat of Gomez's taxi, the man pulled out what Gomez believed to be a silver or white handgun.

Gomez sped off and called 911 at approximately 4:06 a.m. to report an attempted armed robbery by the man. Plainfield Officer Romeo Simeon searched the area, but was unable to locate anyone matching the man's description.

---

[1] A blocked call is one in which the caller first dials *67 to block the recipient's caller ID from revealing the caller's phone number.

At 5:35 a.m., Morel received a call from a man requesting a cab on Spooner Avenue in Plainfield. Later investigation showed that call came from a telephone used by co-defendant Johnathan Morgan.

Morel dispatched another of his drivers, Isidro Leonardo, to pick up that fare. Leonardo's practice was to call Morel right away to say whether he picked up a fare, but Morel did not hear from Leonardo. Morel and Gomez called Leonardo several times, but no one answered. Eventually, Morel sent Gomez, who was in the area, to check on Leonardo. Gomez arrived on Spooner Avenue at the same time as Officer Simeon, who had been dispatched at 5:51 a.m. to respond to a call about a vehicle accident.

Officer Simeon saw Leonardo's taxi cab pinned against a parked vehicle. The taxi was still in gear and Leonardo was in the driver's seat with his head against the headrest. Officer Simeon opened the door, but Leonardo did not respond and was making gurgling sounds. Simeon discovered Leonardo had a gunshot wound to the back of his head.

Leonardo was taken to the hospital where he later died. The autopsy revealed the presence of gunpowder residue on Leonardo's skull, indicating the gun was fired at close range.

Union County Sheriff's Officer Adrian Gardner found defendant's left palm print on the rear side of the partition

3

separating the front and rear seats. Defendant was questioned by a detective. Defendant initially denied being in a taxi on September 28, and later claimed he got a taxi elsewhere. Ultimately, defendant offered a third version.[2]

Defendant admitted his cellphone was used to call United Taxi for the fare Gomez was dispatched to pick up. Defendant denied making any calls from the cellphone that night. However, the phone records showed that the cellphone was used to call defendant's girlfriend, followed immediately by blocked calls to Flash Taxi at 3:58 a.m., 3:59 a.m., 4:00 a.m., and 4:01 a.m., and then the call to United Taxi at 4:02 a.m. At 6:53 a.m., the cellphone was again used to call defendant's girlfriend.[3]

Defendant denied any involvement in the attempted robbery of Gomez or Leonardo. Defendant admitted Morgan "was talking about trying to rob people . . . , everybody was, but that wasn't the main objective," which was to "jump somebody in the projects."

---

[2] We have only the detective's testimony about defendant's statements. Defendant's video statements were played for the jury, but their content was not transcribed by the court reporter and defendant has not provided us with the videos and transcripts introduced as exhibits.

[3] Morgan's cellphone had similarly been used to make blocked calls to Flash Taxi at 4:29 a.m., 5:30 a.m., 5:31 a.m., and 5:34 a.m., to United Taxi at 4:31 a.m. and 4:40 a.m., to Caribe Taxi at 4:48 a.m., and to United Taxi at 4:50 a.m. before the fatal 5:35 a.m. call to United Taxi.

A-4993-14T4

Defendant said he, Morgan, and a man known as "Fuzz" went onto the streets but when they could not find anyone to jump, they abandoned the plan. However, defendant's cousin A.L., known as Fuzz, testified he was not with defendant and Morgan on September 28.

Defendant stated the three men made several calls to taxi cab companies, and that Leonardo's cab finally answered their call. Defendant claimed that an argument over payment erupted between the three men, that Leonardo stopped the cab on Spooner Avenue and told the men to get out because they did not have the money, that he and Fuzz exited the cab, and that defendant then heard a gunshot.

Defendant admitted he knew Morgan often carried a silver revolver, but asserted he did not know Morgan was armed at the time. Defendant claimed he had never used a gun before, and that he did not take part in Leonardo's murder.

The grand jury indicted defendant and Morgan with: count one - first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) or (2); count two - first-degree armed robbery, N.J.S.A. 2C:15-1; count three - first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); count four - second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; count five - second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and count six - second-degree possession of a firearm for an unlawful

purpose, N.J.S.A. 2C:39-4(a)(1). Defendant was tried by a jury between March 19 and April 15, 2013.[4]

The jury acquitted defendant on count one, but found defendant guilty on the remaining counts, specifically finding that defendant conspired to rob Leonardo, Gomez, and other cab drivers. The trial court sentenced defendant to thirty years in prison with a thirty-year period of parole ineligibility on count three, and a concurrent seven years in prison on count four, with an 85% period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The remaining counts merged for sentencing purposes.

Defendant appeals, arguing:

> POINT ONE - THE TRIAL COURT WRONGFULLY EXCLUDED EVIDENCE WHICH REFUTED DEFENDANT'S MOTIVE TO ENGAGE IN ROBBERY.
>
> POINT TWO - THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.
>
> POINT THREE - THE JURY INSTRUCTION ON FELONY MURDER WAS DEFICIENT.

II.

Defendant first argues that the trial court erred in refusing to allow him to admit testimony from his cousin K.M. about a

---

[4] Morgan were tried separately and convicted of felony murder as a non-slayer participant and robbery. We affirm his judgment of conviction in a separate opinion.

6                                                          A-4993-14T4

lawsuit. We must hew to our standard of review. "The trial court's evidentiary rulings 'are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (citation omitted). "[C]onsiderable latitude is afforded a trial court in determining whether to admit evidence." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). "In light of the broad discretion afforded to trial judges, an appellate court evaluates a trial court's evidentiary determinations with substantial deference." State v. Cole, 229 N.J. 430, 449 (2017). "A reviewing court must not 'substitute its own judgment for that of the trial court' unless there was a 'clear error in judgment' — a ruling 'so wide of the mark that a manifest denial of justice resulted.'" State v. Scott, 229 N.J. 469, 479 (2017) (citation omitted).

The State called K.M. to testify about defendant's use of his cellphone, and defendant's attempts to see him after September 28. On cross-examination, defendant's trial counsel elicited that defendant gave K.M. $6 on October 1. Trial counsel asked:

> Q. And when you saw Mr. Parrish, — didn't Mr. Parrish give you money?
>
> A. Yes.

Q.    He gave you money on October 1st; right?

A.    Yes.

Q.    He gave you like $6; right?

A.    $6, yes.

Q.    And it wasn't unusual for Mr. Parrish to have money; am I correct?

A.    No.

Q.    Because Mr. Parrish had just got a big lawsuit where he got a lot of money?

The prosecutor objected. The trial court told the jury it was "striking that portion of [trial counsel's] question which encompassed Mr. Parrish receiving money in a lawsuit and the answer that may have been given to that question about the lawsuit," and instructed the jurors not to consider the question or any answer in their deliberations.

Defendant argues he was trying to show he had money and thus had no financial motive for committing robbery. Generally, "evidence of a defendant's financial state should not be admitted nor commented on." State v. Martini, 131 N.J. 176, 266 (1993). Thus, as the prosecutor noted, the State may not introduce evidence solely to establish "that defendant had no apparent means of income and hence was likely to commit a crime for dollar gain." Ibid. (quoting State v. Mathis, 47 N.J. 455, 472 (1966)); see State v. Patterson, 435 N.J. Super. 498, 510 (App. Div. 2014) (same).

As our Supreme Court explained in Mathis: "Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many." 47 N.J. at 471. The Court followed Wigmore's treatise:

> The lack of money by A might be relevant enough to show the probability of A's desiring to commit a crime in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence.
>
> [Id. at 471-72 (quoting 2 Wigmore on Evidence § 392 at 341 (3d ed. 1940)).]

However, Wigmore took the opposite position on whether a defendant could offer evidence he had money: "On the other hand, the fact that a person was in possession of money tends to negative his desire to obtain it by crime or by borrowing, and is always admissible, the foregoing objection not being here applicable." 2 Wigmore on Evidence § 392 at 343.

Nonetheless, in Wilbely, we rejected Wigmore's position, and "h[e]ld that evidence of the possession of money is not admissible to disprove intent." State v. Wilbely, 122 N.J. Super. 463, 466-67 (App. Div. 1973), rev'd on other grounds, 63 N.J. 420 (1973). We felt that just "as evidence of poverty might well 'prove too much against too many,' evidence of affluence might well result

9

in a proving of too little against too few, and this to the very real detriment and prejudice of fair law enforcement." Id. at 465 (quoting Mathis, 47 N.J. at 471).

In Wilbely, we conceded there was "some relevance with respect to both poverty and affluence." Ibid. We assumed that just as "some poor steal for the sole purpose of rectifying that economic condition," some "scoundrels exist whose larcenous propensities are restrained solely because affluence overcomes a running of the risks involved." Ibid. On the other hand, we found "equally evident" that just as there are "the honest poor," there also are "the thieving wealthy." Id. at 466.

Given the questionable probative value of such evidence, Wilbely viewed the issue at the very least required

> weighing the utility of the relevant aspects
> of the evidence, either of affluence or
> poverty, against reasons opposing
> admissibility, principally such as the
> likelihood of improper inferences being drawn,
> the opportunity for personal prejudices to be
> manifested, or, most significantly, the
> expansion of the fact issues to be tried, and
> this into an area where exculpating perjury
> might well be hard to disprove.
>
> [Id. at 466.]

Applying that "weighing process" to Wilbely's "offer to prove his financial resources in order to disprove his intent to steal," we "conclude[d] that in addition to the reasons bespeaking

nonadmissibility mentioned above, evidence of affluence, while possibly relevant to negate an intent to steal, should not be admissible on account of the likelihood of the involvement of collateral concerns."  Id. at 464, 466.  For example,

> if a defendant is allowed to prove equity in improved real estate, how far can the State go to show that there is little cash to meet the mortgage payments to protect that equity? May defendant then demonstrate accounts receivable and the liquidity of his debtors to refute the prosecutor's implications?  And so on.
>
> [Id. at 466-67.]

We concluded in Wilbely "that even if evidence of affluence were otherwise admissible, it should be excluded on account of unfair prejudice to the State, whose rights and those of the people it represents are also entitled to protection, in the same manner as unfair prejudice to the defendant produced the Mathis exclusion."  Id. at 467.

Wilbely's principle that "a court may consider the prejudice to the State as well as to the defendant in evaluating whether to exclude evidence" has been adopted by commentators and courts. Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5 on N.J.R.E. 403 (2018) (citing Wilbely); see, e.g., State v. Scherzer, 301 N.J. Super. 363, 468 (App. Div. 1997) (citing Wilbely).  N.J.R.E. 403 provides that at the behest of any party,

"relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."

Applying <u>Wilbely</u>, we find no abuse of discretion here. Defendant wanted his cousin to testify that defendant "got a lot of money" in a lawsuit, without proffering what and how his cousin might know. The cousin's proposed testimony posed issues of hearsay and an "expansion of the fact issues to be tried . . . into an area where exculpating perjury might well be hard to disprove." <u>Id.</u> at 466. It also raised collateral issues of how much defendant had received, how much he had spent or dispensed to others (e.g., civil and criminal counsel, medical providers, relatives, and creditors), how great his expenses were, and so on. <u>Id.</u> at 467; <u>see</u> <u>State v. Medina</u>, 201 N.J. Super. 565, 581 (App. Div. 1985) (applying <u>Wilbely</u> and excluding evidence "because of the collateral questions it could raise").

Thus, defendant's proposed evidence opened new issues that could entail undue delay to allow the State to investigate and to present counter-testimony, waste of time on collateral issues, and confusion of the issues and of the jury. N.J.R.E. 403. Its probative value was limited because those who have money may seek more money through criminal activities — as illustrated by

defendant's admission that he had been discussing robbing someone with Morgan. Wilbely, 122 N.J. Super. at 466. That limited value was substantially outweighed by the concerns above as well as the risk of improper inferences, personal prejudices (e.g., against litigious plaintiffs), and undue prejudice to the State which was barred from making the mirror-image argument that defendant sought to rob because he needed money. Ibid.; see N.J.R.E. 403.

Defendant cites opinions in which we have upheld the State's introduction of counter-evidence when defendants contended they had money and therefore no motive to commit the charged crimes. E.g., Patterson, 435 N.J. Super. at 510-11; State v. Downey, 237 N.J. Super. 4, 16 (App. Div. 1989); State v. Farr, 183 N.J. Super. 463, 469 (App. Div. 1982). However, those defense appeals did not address whether the defendants' presentation of such evidence was proper. Thus, our opinions did not reach or resolve the issue we squarely decided in Wilbely.

Defendant notes that "[t]he Federal and New Jersey Constitutions guarantee criminal defendants 'a meaningful opportunity to present a complete defense.'" State v. Garron, 177 N.J. 147, 168 (2003) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). Nonetheless, "the introduction of [defense] evidence is . . . subject to 'the application of evidentiary rules that themselves serve the interests of fairness and reliability.'"

State v. Rosales, 202 N.J. 549, 562 (2010) (quoting Crane, 476 U.S. at 690).

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude [defense] evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.
>
> [Holmes v. South Carolina, 547 U.S. 319, 326-27 (2006) (citing, e.g., Fed. R. Evid. 403).]

N.J.R.E. 403 is just such a well-established rule of evidence. It serves a legitimate purpose, and its balancing test ensures that its application is not disproportionate. Thus, "trial courts must still determine that the probative value of [defense] evidence is not substantially outweighed by any of the Rule 403 factors." State v. Weaver, 219 N.J. 131, 151 (2014); see State v. Perry, 225 N.J. 222, 237 (2016) (citing N.J.R.E. 403).

Here, the limited probative value of any evidence that the question could elicit from defendant's cousin was "substantially outweighed" by the risk of undue prejudice, confusion, undue delay, and waste of time. N.J.R.E. 403. By contrast, only "evidence relevant to the defense that has probative value outweighing its prejudicial effect must be placed before the trier of fact" under the New Jersey Constitution. Garron, 177 N.J. at 172. "Stated a

14

different way, if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." Id. at 171. Because the probative value of the cousin's evidence did not outweigh its prejudicial effect, it was not necessary to the fair determination of the issues. See, e.g., Perry, 225 N.J. at 243-45.

The United States Supreme Court has "[o]nly rarely . . . held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." Nevada v. Jackson, 569 U.S. 505, 509 (2013). This is not one of those rare cases.

In any event, we must also "determine whether any error found is harmless." Prall, 231 N.J. at 581. "Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. The cousin's evidence that defendant "had no financial motive to participate in a robbery" "was of relatively insignificant probative weight." State v. Smith, 32 N.J. 501, 526 (1960). Moreover, the cousin's testimony that "it wasn't unusual for [defendant] to have money," and that defendant had given him $6, "remained before the jury." See ibid. Trial counsel used that evidence, and defendant's statement to police that he could

pay his share of the cab fare, to argue in summation that "[w]e know [defendant's] got money."

Thus, "[t]he action of the trial court in this respect did not amount to reversible error." Id. at 525-26 (finding any error in excluding other "evidence of [a defendant's] financial condition at the time of the crime" was harmless where the defendant was able to elicit he had a $44 per week job and a bank account). This was not a situation "where there was no other available evidence to demonstrate particular defense issues." Scherzer, 301 N.J. Super. at 414.

### III.

Defendant next claims the trial court erred in denying his motion for acquittal on the count charging conspiracy to commit robbery. Appellate courts "review the record de novo in assessing whether the State presented sufficient evidence to defeat an acquittal motion." State v. Dekowski, 218 N.J. 596, 608 (2014). The "well-established standard for determining the sufficiency of the evidence," State v. Wilder, 193 N.J. 398, 406 (2008), was set forth in State v. Reyes, 50 N.J. 454, 459 (1967):

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a

> reasonable jury could find guilt of the charge beyond a reasonable doubt.

A person is guilty of conspiracy with another person to commit robbery if

> with the purpose of promoting or facilitating its commission he:
>
> (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
> [N.J.S.A. 2C:5-2(a).]

A conspiracy to commit robbery does not require the robbery occur. "Actual commission of the crime is not a prerequisite to conspirator liability." In re State ex rel. A.D., 212 N.J. 200, 222 (2012) (quoting State v. Samuels, 189 N.J. 236, 245-46 (2007)). Indeed, "[n]o overt act need be proven to convict of conspiracy to commit a crime of the first or second degree," such as robbery. State v. Hardison, 99 N.J. 379, 387-88 (1985); see N.J.S.A. 2C:5-2(d); N.J.S.A. 2C:15-1. "The only question is whether a reasonable jury, viewing the State's evidence in its most favorable light, could find beyond a reasonable doubt that defendants, acting with a purposeful state of mind, agreed to commit, attempted to commit,

or aided in the commission of [the crime]." Scherzer, 301 N.J. Super. at 401.

"Because the conduct and words of co-conspirators is generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." Samuels, 189 N.J. at 246. Here there was direct evidence, and ample circumstantial evidence, that defendant agreed to commit, attempt, or aid robbery. Additionally, there was evidence the conspirators committed multiple acts which corroborated their agreement.

Defendant admitted Morgan and "everybody," including defendant, were "talking about trying to rob people." Defendant and Morgan repeatedly called United Taxi, Flash Taxi, and Caribe Taxi, often blocking their numbers from caller ID. When United Taxi dispatched Gomez's taxi, a man drew a silver gun and tried to enter. When United Taxi dispatched Leonardo's taxi, defendant admittedly got in the taxi with Morgan. The right-handed defendant's left palm print was on the partition through which Leonardo was shot. Given the absence of shell casings in the taxi, it was a reasonable inference Leonardo was shot with a revolver. Defendant admitted Morgan often carried a silver revolver. Based on all the evidence, a reasonable jury could find that defendant and Morgan agreed to rob a taxi driver in the pre-dawn hours, and repeatedly tried to do so.

Defendant argues the evidence was insufficient to support a conspiracy to rob taxi drivers from Flash Taxi or Caribe Taxi. However, the number and frequency of calls by defendant and Morgan to all three taxi companies supported a reasonable inference that they had agreed to rob whatever taxi driver responded, as they tried to rob both Gomez and Leonardo. As there was sufficient evidence of that agreement, it is irrelevant whether Flash Taxi and Caribe Taxi answered or responded to defendants' calls. "It is the agreement that is pivotal." Ibid.

Defendant argues there was insufficient evidence of a conspiracy to rob Gomez. However, Gomez testified the man who tried to get in his taxi was around 6'0" tall; defendant was over 5'8", while Morgan was 5'2" or less. Gomez testified that he saw the man had a gun, that "I thought it was a gun because I had seen them before in my country," and that as soon as he saw the gun he "sped off with the doors open." Based on that testimony and all the evidence, it was a reasonable inference that the man was defendant, that he had a gun, and that he intended to rob Gomez as he and Morgan had agreed. See id. at 248-49. The jury could rely on that testimony even though Gomez expressed uncertainty on cross about the object he saw, and defendant denied involvement. Scherzer, 301 N.J. Super. at 404.

On its verdict sheet, the jury found defendant guilty of conspiracy to commit robbery generally, and specifically against Leonardo, Gomez, and taxi drivers from the other taxi companies. We must uphold defendant's conspiracy conviction if there was sufficient evidence to support a conspiracy to rob any one of those victims. See N.J.S.A. 2C:5-2(c). We find the evidence was sufficient as to each of the victims. Indeed, defendant does not appeal the sufficiency of the evidence he conspired to rob Leonardo and committed robbery against him.

## IV.

Finally, on appeal, defendant for the first time challenges the jury instructions on the crime of felony murder. The trial court instructed the jury using Model Jury Charge (Criminal), "Felony Murder — Slayer Participant (N.J.S.A. 2C:11-3a(3))" (rev. Mar. 22, 2004) [Slayer Charge]. Defendant now claims the court sua sponte should also have instructed the jury using Model Jury Charge (Criminal), "Felony Murder — Non-Slayer Participant (N.J.S.A. 2C:11-3a(3))" (rev. Mar. 22, 2004) [Non-Slayer Charge].

Where a defendant "does not request the [non-slayer] instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." State v. Walker, 203 N.J. 73, 87 (2010). Moreover, such a defendant must at least show plain error. Id. at 78, 89-90. A

defendant claiming plain error must demonstrate "'[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Id. at 90 (citation omitted); see R. 2:10-2.

Defendant did not merely fail to request the instruction; he agreed the trial court's charge was acceptable. Thus, his claim on appeal is barred by the doctrine of invited error. "Under that settled principle of law, trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (citation omitted).

At the final charge conference, the trial court noted: "I've been working on what I believe is now the final version of the charge with counsel extensively during the course of the trial up through and including today." The court presented the parties with the "proposed jury charge," which included the Slayer Charge, but not the Non-Slayer Charge. After counsel and the court discussed various instructions, including felony murder and lesser-included offenses, the court asked:

> THE COURT: . . . So having said those things, is my 32-page charge as it exists, with the changes that were pointed out to the Court by

counsel on the enumerated pages, acceptable?
Is the charge acceptable?

[DEFENSE COUNSEL]: Yes, Your Honor.

"At the very least, [defendant] consented or acquiesced to" the trial court's proposed charge by stating it was acceptable, which encouraged and induced the court to give that charge. A.R., 213 N.J. at 563; see N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 339-40, 341 (2010) (finding defense counsel consented to the admission of evidence by agreeing he was not objecting). Thus, defendant invited the court to give its charge without the Non-Slayer Charge, and he is "barred by the doctrine of invited error from contesting" the charge. That bars defendant's belated challenge to the charge. See Brett v. Great Am. Rec., 144 N.J. 479, 503-04 (1996); see State v. Ramseur, 106 N.J. 123, 282 (1987); see also State v. Munafo, 222 N.J. 480, 487 (2015).

"'Even if a party has "invited" an error, though, courts will not bar defendants from raising an issue on appeal if "the particular error . . . cut mortally into the substantive rights of the defendant"'" or "would '"cause a fundamental miscarriage of justice,"'" A.R., 213 N.J. at 562 (first quoting State v. Corsaro, 107 N.J. 339, 345 (1987); then quoting M.C. III, 201 N.J. at 342 (quoting Brett, 144 N.J. at 508)). However, "this case

22

presents no fundamental injustice that would warrant relaxing the invited error doctrine."  See M.C. III, 201 N.J. at 342.

The Slayer Charge defendant received was more favorable to him than the Non-Slayer Charge.  Using the Slayer Charge, the trial court instructed the jury: the State contended defendant "shot and killed Isidro Leonardo"; and "the State must prove beyond a reasonable doubt" both that "the death of Isidro Leonardo was caused by the defendant," and that "but for defendant's conduct in the commission of or attempt to commit or flight after committing or attempting to commit robbery, the victim would not have died."

By contrast, under the Non-Slayer Charge, the court would have instructed the jury "[t]he State does not contend that defendant himself[] killed" the victim, and "it does not matter that the act which caused death was committed by a participant in the crime of [robbery] other than the defendant."  Id. at 1.  The court also would not have required the State to prove the victim's death was caused by defendant, and instead would have required the State to prove merely that "but for defendant's conduct or the conduct of one or more others with whom the defendant participated in the commission of, or attempt to commit or flight after committing or attempting to commit [robbery], the victim would not have died."  Id. at 2-3 (emphasis added).  Thus, giving the Non-

Slayer Charge would have given the jury another way to convict defendant of felony murder, without having to find either that he caused Leonardo's death or that Leonardo would not have died but for defendant's conduct.

Nonetheless, defendant claims the Non-Slayer Charge is favorable because it contains an affirmative defense "if there is proof" that the defendant was not the only participant in the crime and that the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
>
> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
>
> [Id. at 5; see N.J.S.A. 2C:11-3(a)(3)(a)-(d).]

However, that affirmative defense would not have prevented defendant's conviction of felony murder under the trial court's Slayer Charge, which required the jury to find defendant caused the victim's death, in contravention to the first prerequisite of

24

the affirmative defense.  See N.J.S.A. 2C:11-3(a)(3)(a).  "[T]he affirmative defense leaves unaffected the imposition of absolute liability" on the primary actor, and "merely narrows the circumstances in which an accomplice, as distinguished from the primary actor, may be liable for felony murder." State v. Martin, 119 N.J. 2, 23 (1990).

In any event, there must be "some evidence to support each of the four factors" before an instruction on the affirmative defense should be given. Walker, 203 N.J. at 84, 89. Although defendant stated he had never used a gun before, he does not point us to evidence he was not armed.  Even assuming his statements contained such evidence, his claim fails. In Walker, our Supreme Court found an erroneous failure to charge the affirmative defense was not plain error because "the findings of the jury negated most of the factors required to establish the affirmative defense." Id. at 78, 89-91.

> [T]he jury convicted defendant of conspiracy
> [to commit robbery], robbery, reckless
> manslaughter as a lesser-included offense of
> knowing or purposeful murder, and possession
> of a knife.  For those convictions, the jury
> had to conclude that defendant aided the
> commission of the homicidal act, (reckless
> manslaughter); possessed a deadly weapon,
> (possession of a knife); had reason to believe
> the codefendant was armed with a knife,
> (conspiracy and reckless manslaughter); and
> engaged in conduct likely to result in death
> or serious physical injury, (reckless

manslaughter).  Thus, the jury, although not charged with the affirmative defense to felony murder, found against defendant on most, if not all, of the four prongs of the defense.

[Id. at 90; see id. at 82.]

Here, the jury found the State proved beyond a reasonable doubt that defendant possessed a handgun unlawfully and for an unlawful purpose, which negated that he "[w]as not armed with a deadly weapon," one of the prerequisites for the affirmative defense.  N.J.S.A. 2C:11-3(a)(3)(b).  "[I]t is sufficient for the State in such case to present proof beyond a reasonable doubt negating any one of them."  Non-Slayer Charge at 5; see State v. Ingram, 196 N.J. 23, 35, 43 (2008) (approving a judge's instruction that "the State has [the] burden to disprove one of those elements"); see also State v. Smith, 322 N.J. Super. 385, 396 (App. Div. 1999) (finding the affirmative defense does not apply if the evidence "did not provide any support for" one factor).

Moreover, by convicting defendant of felony murder, the jury necessarily found elements which negated another prerequisite for the affirmative defense.  As the State argued, defendant could be convicted of felony murder either (1) as the shooter under the Slayer Charge or (2) as an accomplice to the shooter.[5]

---

[5] Defendant argues the jury could have convicted him of felony murder as a conspirator, but he was not charged with conspiring

Under the first option, if the jurors convicted defendant of felony murder under the Slayer Charge, they found the death of the victim was "caused by the defendant." That finding would be inconsistent with the affirmative defense's prerequisite that the defendant "[d]id not commit the homicidal act or in any way . . . cause . . . the commission thereof." N.J.S.A. 2C:11-3(a)(3)(a).

Defendant contends the jury found he was not the shooter because it acquitted him of murder. However, the jury could have found that defendant was the shooter but did not act "purposely or knowingly," as required by the court's instructions on murder. See N.J.S.A. 2C:11-3(a)(1), (2). Defendant cites a question from the jury: "If the State does not have enough evidence to prove that, one, Wallace Parrish committed the murder of Isidro Leonardo; two, [Morgan] committed the murder of Isidro Leonardo, can Wallace Parrish be convicted of felony murder as an accomplice?" That question does not say whether the jury convicted defendant under the Slayer Charge or as an accomplice; indeed, the trial court instructed the jury to refer to both its Slayer Charge and its accomplice charge.

---

to commit felony murder, and the trial court instructed the jury that "[c]onspiracy to commit robbery is a separate offense from robbery and cannot be a basis for a conviction of felony murder."

A-4993-14T4

In any event, under the second option, the trial court instructed that the jury could convict defendant as an accomplice of another person only "if, with the purpose of promoting or facilitating the commission of the offense, he (a) solicits such other person to commit it and/or (b) agrees or attempts to aid such person in planning or committing it."  See N.J.S.A. 2C:2-6(c)(1)(a), (b).  That finding would be inconsistent with the affirmative defense's prerequisite that the defendant "[d]id not . . . in any way solicit . . . or aid the commission" of the homicidal act."  N.J.S.A. 2C:11-3(a)(3)(a).

Therefore, whether the jury convicted defendant as the shooter or the shooter's accomplice, the jury necessarily had to find that the State proved beyond a reasonable doubt an element that negated N.J.S.A. 2C:11-3(a)(3)(a), another prerequisite for the affirmative defense.  "Thus, the jury, although not charged with the affirmative defense to felony murder, found against defendant on [two], if not all, of the four prongs of the [affirmative] defense."  Walker, 203 N.J. at 90.

The jury also found defendant committed robbery and conspiracy to commit robbery.  We need not reach whether those convictions were inconsistent with the affirmative defense.  See State v. Belliard, 415 N.J. Super. 51, 76 (App. Div. 2010) (indicating that a defendant must have "had nothing to do with the

A-4993-14T4

act that caused the death" and that "the intent and preset plan [must be] to commit a non-violent felony").

In any event, the jury found facts beyond a reasonable doubt that were inconsistent with at least one of the prerequisites for the affirmative defense. Thus, "we do not believe that the failure to give the omitted charge on the defense to felony murder would have altered the jury's conclusions," and any failure to instruct on the affirmative defense did not have the capacity to result in "an unjust result." Walker, 203 N.J. at 90-91; State v. Sheika, 337 N.J. Super. 228, 251 (App. Div. 2001). "Nor was the alleged error of such moment as to '"cut mortally into the substantive rights of the defendant[]."'" Ibid. (quoting Corsaro, 107 N.J. at 341). We see no reason to reverse based on an alleged error defendant invited.

Defendant's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4993-14T4