**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2854-16T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MAMADEE KAMARA,

      Defendant-Appellant.

                Argued telephonically February 15, 2019 –
Decided May 15, 2019

Before Judges Yannotti, Gilson and Natali.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 13-10-2016.

Susan L. Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan L. Romeo, of counsel and on the brief).

Jaimee M. Chasmer, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, on the brief).

PER CURIAM

Defendant Mamadee Kamara was indicted for three crimes related to the armed robbery of L.B.[1] A jury convicted defendant of first-degree robbery, N.J.S.A. 2C:15-1; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). Defendant was sentenced to an aggregate term of twelve years in prison, with periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals his convictions and sentence. He argues (1) it was improper to admit portions of his recorded police interview where the officers questioned him about his financial circumstances and allegedly mocked his religious beliefs; and (2) the court abused its discretion in denying his request for a Wade[2] hearing concerning his identification. He also contends that his sentence should be reversed because the court failed to properly weigh aggravating factor nine, the need for deterrence. Having reviewed defendant's arguments in light of the applicable law, we affirm in part and remand with direction that the trial court conduct a full Wade hearing.

---

[1] We use initials to protect the privacy interests of the victim and witnesses.

[2] United States v. Wade, 388 U.S. 218 (1967).

A-2854-16T3

I.

The evidence at trial established that at approximately 11 a.m. on March 20, 2013, L.B. was robbed at the corner of University Avenue and Market Street in Newark. L.B. testified that as she was walking on Branford Place, she noticed a young African-American male walking closely behind her. At the next intersection, L.B. turned left on to University Avenue and the man continued walking straight on Branford Place. L.B. walked north on University Avenue until the road intersected with Market Street where she turned right. As she was turning, L.B. heard footsteps and then saw the man from Branford Place standing in front of her and pointing a gun at her chest. The man told L.B.: "[D]on't move or I will kill you, give me your pocketbook."

L.B. let go of her pocketbook, the man grabbed her pocketbook and as he ran away, L.B. screamed for help. At approximately that time, B.P., who was then working for the Newark Downtown District and was in the area, looked up and saw a man point a gun at L.B., take her pocketbook, and run away. B.P. came over to L.B., who told him that she had just been robbed. B.P. then chased the robber.

B.P. testified that he followed the robber, but stayed approximately forty to fifty feet behind him because he knew he was armed. When the robber

reached Martin Luther King Jr. Boulevard, he stopped and began pacing up and down the sidewalk. B.P. saw a car pull up and the robber entered the rear passenger side of the vehicle, which then left. B.P. walked into the road to see the vehicle's license plate as it drove away, and he was able to make out the license plate number. Thereafter, B.P. gave that license plate number to the police.

Meanwhile, L.B. had tried to follow B.P. and the robber, but lost sight of them. L.B. worked as a secretary in the prosecutor's office, and a work colleague was driving on University Avenue when she observed L.B. and pulled over to check on her. L.B. told the colleague she had been robbed and the colleague called 911.

The police responded, and L.B. and B.P. thereafter gave statements to the police. Both described the robber. L.B. described the robber as approximately five-feet-eleven-inches tall, a young African-American man with a thin build. She also told the police that the robber had "distinct eyes" that "were kind of slanted" and "like oriental."

Thereafter, a detective from the Newark Police Department began investigating the robbery. By tracing the license plate number given by B.P., the detective learned that the motor vehicle was registered to the girlfriend of

defendant and defendant had received motor vehicle summonses while driving that vehicle. Consequently, the detective determined that defendant was a person of interest and he compiled photo arrays. The detective and other officers from the Newark Police Department then contacted both L.B. and B.P. to see if they could identify defendant from a photo array.

Approximately three weeks after the robbery, on April 10, 2013, three detectives went to L.B.'s home to conduct a photo array. The array was administered by a detective who was not involved in the investigation. L.B. selected the photograph of defendant as the robber. That identification procedure was audio recorded and detailed in a subsequent police report dated April 22, 2013, which was authored by the lead investigating detective. At trial, L.B. explained that she was confident in her photograph selection. L.B. also identified defendant at trial.

The next day, on April 11, 2013, the detectives created a second photo array and showed that array to B.P. Again, the detective who presented the array was not involved in the investigation. B.P. selected the photograph of defendant. As with the identification by L.B., B.P.'s out-of-court identification procedure was audio recorded, and later detailed in the lead detective's April 22, 2013 police report.

5

Defendant was arrested on April 12, 2013. Following his arrest, he was given his <u>Miranda</u>[3] rights, which he waived. Defendant then participated in a recorded interview with detectives. During that interview, defendant told the detectives he was in Newark on the date and time of the robbery. He stated that while he was driving to work, at approximately 11 a.m., he observed a man with a gun running on Branford Place and that man was being chased by a second man in a yellow jacket. Defendant was not able to recall what the man with the gun looked like, other than that he was a "black kid" wearing a hoodie. Defendant denied knowing the person he saw running and denied that person got into the car with him. Defendant also denied having anything to do with the robbery.

While being questioned by the police, defendant acknowledged that he never notified the police of what he saw. In explaining why he had not called the police, defendant stated that based on his religion he did not get involved in things that did not concern him. The police then asked defendant what religion he practiced, and defendant responded that he was Muslim.

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-2854-16T3

The detectives also questioned defendant about his financial and familial circumstances. During that questioning, defendant stated that he had a bank account and he sent money to his family in Africa.

In October 2013, a grand jury indicted defendant for three crimes related to the armed robbery. On February 20, 2015, in preparation for trial, defense counsel requested a Wade hearing, contending that the out-of-court photo array identifications by L.B. and B.P. should be excluded from the trial due to law enforcement officers' suggestiveness. At the time the request was made, defendant was not present in court.

The trial court did not hold a hearing on that request. Instead, the court heard oral arguments by counsel and reviewed the audio recordings of the photo arrays. On March 13, 2015, the court issued a written decision denying the request for a Wade hearing. Based on its review of the recorded photo arrays, the court concluded that defendant had made no showing of suggestiveness. The court's initial decision referenced only the identification made by B.P. Thereafter, the court supplemented its decision on April 16, 2015, and denied the request for a Wade hearing concerning the identifications made by both L.B. and B.P.

Pretrial, the State also moved to admit a redacted audio recording of defendant's statement. The court conducted a hearing. During that hearing, defense counsel objected to the admission of defendant's statement describing the method he used to send money to his family in Africa and his agreement to testify in court. After hearing oral argument and testimony from the lead detective, the court granted the State's motion to admit defendant's statement with the redactions requested by defense counsel.

In September 2016, a four-day jury trial was conducted. At trial, there was testimony that the lead detective on the investigation spoke with L.B. and B.P. alone before they were shown their photo arrays. In that regard, the detective who conducted the photo array for L.B. testified that when the detectives went to the home of L.B. to show the photo array, the lead detective initially went into L.B.'s apartment by himself. The lead detective also testified at trial that when B.P. was shown a photo array, he initially walked B.P. into the interview room, opened the statement concerning the photo array, and went over that statement with B.P. Thereafter, the detective who was not involved with the investigation conducted the photo array. Defense counsel did not renew his request for a Wade hearing based on the testimony that was given at trial.

After hearing the evidence at trial, a jury convicted defendant of first-degree armed robbery, second-degree possession of a weapon for an unlawful purpose, and second-degree unlawful possession of a handgun.

Defendant was then sentenced on November 18, 2016. On the conviction of first-degree armed robbery, defendant was sentenced to twelve years in prison subject to NERA. The conviction for second-degree possession of a weapon for an unlawful purpose was merged with the armed robbery conviction. Defendant was also sentenced to a concurrent term of five years for the conviction of second-degree unlawful possession of a handgun. Ten days later, on November 28, 2016, the court held a supplemental sentencing proceeding to advise defendant that as part of his sentence for armed robbery, he was subject to a five-year period of parole supervision following his release from prison as required by NERA.

## II.

On appeal, defendant makes three arguments, which he articulates as follows:

> POINT I – IT WAS PLAIN ERROR FOR THE COURT NOT TO SANITIZE THE EXTENSIVE PORTIONS OF DEFENDANT'S TAPED STATEMENT WHERE THE POLICE: 1) QUESTIONED DEFENDANT'S FINANCES AND LIFESTYLE, SUGGESTING THAT HE COMMITTED THE ROBBERY BECAUSE,

ALTHOUGH HE HAD A FULL-TIME JOB, HE WAS TOO POOR TO AFFORD THE CAR, APARTMENT, FURNITURE, CLOTHES AND FINANCIAL ASSISTANCE THAT HE PROVIDED TO HIS FAMILY IN AFRICA, AND 2) MOCKED DEFENDANT'S RELIANCE ON HIS MUSLIM RELIGIOUS BELIEFS.

POINT II – THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS WHEN IT DENIED HIS REQUEST FOR A HEARING PURSUANT TO UNITED STATES V. WADE, 388 U.S. 218 (1967), WITHOUT PROVIDING DEFENDANT WITH: 1) THE OPPORTUNITY TO SUBMIT EVIDENCE THAT SHOWED A COURSE OF IMPROPER CONDUCT BY THE POLICE BEFORE PRESENTATION OF THE PHOTO ARRAYS, AND 2) THE OPPORTUNITY TO BE PRESENT AT THE PRETRIAL PROCEEDINGS ON THAT ISSUE.

POINT III – DEFENDANT'S SENTENCE MUST BE REVERSED BECAUSE, IN THE ABSENCE OF ANY FINDINGS ON A NEED FOR SPECIFIC DETERRENCE, THERE WAS NO SUPPORT FOR THE TRIAL COURT'S FINDING THAT THE SINGLE AGGRAVATING FACTOR OF THE NEED FOR GENERAL DETERRENCE SUBSTANTIALLY OUTWEIGHED THE MITIGATING FACTOR THAT DEFENDANT HAD NO PRIOR CRIMINAL RECORD.

Having reviewed these arguments in light of the record and law, we affirm

the ruling on defendant's statement and his sentence, but remand for a full

10

hearing on the out-of-court identifications. We will address the arguments in the order they were raised by defendant.

A. Defendant's Statement to Law Enforcement Officers

Defendant first argues that his conviction should be reversed because the court erred in admitting certain parts of his recorded statement to law enforcement officers. Specifically, defendant contends that the jury heard the officers insinuate that defendant robbed the victim because he did not have enough money to finance the lifestyle he maintained for his family and heard the officers mock defendant's religious beliefs.

Defendant did not object to the admission of the portions of the recorded statement he gave to law enforcement officers that he now challenges. Indeed, defendant twice failed to object to these portions of his statement. Accordingly, we review the admission of those statements for plain error. R. 2:10-2. Under that standard, reversal is only appropriate if the error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2).

It is improper for the State to use poverty or lack of financial means as evidence of a defendant's motive to commit a crime. State v. Mathis, 47 N.J. 455, 472 (1966) ("[T]here must be something more than poverty to tie a

A-2854-16T3

defendant into a criminal milieu."); State v. Terrell, 359 N.J. Super. 241, 247 (App. Div. 2003); State v. Stewart, 162 N.J. Super. 96, 100 (App. Div. 1978). Accordingly, "[t]he introduction of evidence regarding whether or not a defendant has a regular source of income is, when a collateral issue, prohibited in any form." Terrell, 359 N.J. Super. at 247. Courts have ordered new trials or reversed convictions based on admission of such evidence when elicited from a defendant or other witnesses and when referenced by the State in opening or closing arguments. See Mathis, 47 N.J. at 469-72; Terrell, 359 N.J. Super. at 247-48; State v. Sherman, 230 N.J. Super. 10, 19 (App. Div. 1988) (ordering a new trial after the assistant prosecutor "used his summation . . . to suggest that defendant committed the crimes with which he was charged because he was without funds").

Here, defendant has not shown, and there is nothing in the record indicating, that the admission of his statement to law enforcement officers was clearly capable of producing an unjust result. The State did not question any of the trial witnesses about defendant's financial circumstances, nor did the State suggest in its opening or closing arguments that defendant had committed the crime due to his financial circumstances. The questions posed to defendant and his responses, which the jury heard when defendant's recorded statement was

12

played, did not directly suggest that defendant committed the robbery because of his financial circumstances. Instead, those questions were more in the nature of general background questions. Thus, the situation here is distinguishable from the facts in Mathis, Terrell, and Sherman.

Moreover, there was strong evidence linking defendant to this crime. The victim and a witness identified defendant as the robber. The police also located defendant based on a license plate number which, after investigation, proved to be the license to the car of his girlfriend and there was a record that defendant had driven that car.

Defendant also argues that his conviction should be reversed because he was prejudiced when the detectives mocked his religious beliefs. The record does not support that contention. While questioning defendant, the detectives did ask him about his religion when defendant asserted that he had not called the police after seeing a man running on the sidewalk with a gun because of his religious beliefs. A review of the record shows that this exchange was relatively brief in duration and did not contain any mocking of defendant's religion. Instead, defendant was asked whether there was anything in his religion, including within the Koran, which would prohibit him from reporting a crime to

13

the police. Heard in context, the questioning cannot be reasonably construed as mocking defendant's religious beliefs.

B. The Request for a <u>Wade</u> Hearing

Next, defendant argues that the trial court abused its discretion in denying his request for a <u>Wade</u> hearing. In connection with that argument, defendant also contends that the court converted a status conference, at which defendant did not appear, into an argument on whether defendant was entitled to a <u>Wade</u> hearing.

We review a denial of a request for a <u>Wade</u> hearing under an abuse of discretion standard. <u>State v. Ortiz</u>, 203 N.J. Super. 518, 522 (App. Div. 1985). <u>See also</u> <u>State v. Henderson</u>, 208 N.J. 208, 290-91 (2011). Generally, we will not disturb a trial court's finding that the photographic identification procedures were reliable if there is sufficient credible evidence in the record to support that finding. <u>State v. Adams</u>, 194 N.J. 186, 203 (2008). Moreover, even if a reviewing court finds that the trial court should have conducted a <u>Wade</u> hearing, but also finds that the identification procedures did not result in "a very substantial likelihood of irreparable misidentification," the ruling can still be affirmed. <u>State v. Anthony</u>, ___ N.J. ___,___ (2019) (slip op. at 35) (quoting

Henderson, 208 N.J. at 289); State v. Cherry, 289 N.J. Super. 503, 517 (App. Div. 1995).

Identifications of a defendant are often critical evidence. See Anthony, ___ N.J. at ___ (slip op. at 2). Accordingly, pretrial identification procedures must comply with due process. If a process is overly suggestive, the identification may be excluded to protect defendant's constitutional rights. Foster v. California, 394 U.S. 440, 443 (1969); Henderson, 208 N.J. at 285-87 (first citing Manson v. Brathwaite, 432 U.S. 98, 112-16 (1977); then citing State v. Madison, 109 N.J. 223, 239 (1988)). To safeguard a defendant's constitutional rights, law enforcement officials must document their identification procedures. See R. 3:11; Anthony, ___ N.J. at ___ (slip op. at 2, 17-21); Henderson, 208 N.J. at 278, 298; State v. Delgado, 188 N.J. 48, 63 (2006).

Rule 3:11 enumerates the documentation requirements for pretrial identification procedures. Specifically, Rule 3:11(a) provides that "[a]n out-of-court identification resulting from a photo array, live lineup, or showup identification procedure conducted by a law enforcement officer shall not be admissible unless a record of the identification procedure is made." The rule then details how law enforcement should record identification procedures and

15

what type of information should be included in that recording.  See R. 3:11(b) to (c); Anthony, ___ N.J. at ___ (slip op. at 20-21) (quoting R. 3:11).  Relevant to this appeal, the record should include, "the identity of any individuals with whom the witness has spoken about the identification, at any time before, during, or after the official identification procedure, and a detailed summary of what was said."  R. 3:11(c)(8).

Where a record "is lacking in important details" and law enforcement could have obtained and preserved those details, Rule 3:11 authorizes the trial courts in their "sound discretion and consistent with appropriate case law" to (1) "declare the identification inadmissible," (2) "redact portions of the identification testimony," and (3) "fashion an appropriate jury charge to be used in evaluating the reliability of the identification."  R. 3:11(d); accord Anthony, ___ N.J. at ___ (slip op. at 21) (quoting R. 3:11(d)).

A defendant may request a pretrial hearing to evaluate the reliability and admissibility of a pretrial identification.  Such a hearing is commonly known as a Wade hearing.  There is no absolute right to a Wade hearing and such a hearing is not granted in every case involving an out-of-court identification.  Henderson, 208 N.J. 288-89; State v. Ruffin, 371 N.J. Super. 371, 391 (App. Div. 2004).  To obtain a Wade hearing, a defendant is usually required to show "some evidence

16

of suggestiveness that could lead to a mistaken identification." Henderson, 208 N.J. at 288. "That evidence, in general, must be tied to a system—and not an estimator—variable." Id. at 288-89. System variables are factors within the control of the criminal justice system. Id. at 247. Estimator variables, in contrast, "are factors related to the witness, the perpetrator, or the event itself —like distance, lighting, or stress—over which the legal system has no control." Ibid. If a court finds that the procedure was impermissibly suggestive, then the State must "offer proof to show that the proffered eyewitness identification is reliable[.]" Id. at 289. "[T]he ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Ibid.

Our Supreme Court recently recognized an exception to the requirement that a defendant must show some evidence of impermissible suggestiveness that could lead to a mistaken identification. In that regard, in Anthony, the Court held that a defendant is "entitled to a pretrial hearing on the admissibility of identification evidence if Delgado and Rule 3:11 are not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." Anthony, ___ N.J. at ___ (slip op. at 26-27). Indeed, "[i]n such cases, defendants will not need to offer proof of suggestive behavior tied to a system variable to get a pretrial hearing." Id. at ___ (slip op. at 27). In

A-2854-16T3

reaching its holding, the Court explained that "defendants need a full record of the identification procedure to gather possible evidence of suggestiveness." Id. at ___ (slip op. at 26). The Court went on to stress that "[t]he failure to provide that information should not deprive defendants of the opportunity to probe about suggestive behavior that may have tainted an identification." Id. at ___ (slip op. at 26).[4]

Here, the identifications of defendant as the armed robber by L.B. and B.P. were crucial evidence leading to defendant's conviction. Based on the evidence adduced at trial, it appears that the recordings did not fully capture the conversations between the witnesses and the lead investigating detective. Accordingly, we remand for a Wade hearing to explore those unrecorded conversations.

When defendant requested a pretrial hearing concerning the identification made by B.P., he argued that B.P.'s statements to the police included certain discrepancies. In that regard, defendant argued that there was a discrepancy in B.P.'s description of the car that defendant entered, the license plate that B.P.

---

[4] The decision in Anthony was issued after this appeal was argued. Counsel for defendant submitted a letter in accordance with Rule 2:6-11(d) contending that the reasoning in Anthony was applicable to defendant's appeal. The State did not respond to that letter.

A-2854-16T3

collected, and the distance at which B.P. made his identification. Defendant also challenged B.P.'s ability to see what he claimed to see concerning the car. With regard to the identification made by L.B., defendant argued that one of the investigating detectives told L.B. that she would be examining photographs of individuals that may contain a suspect.

As previously noted, the trial court did not hold a hearing. Instead, the court listened to the audio recordings of the out-of-court identifications made by both B.P. and L.B. The trial court found that the procedures used were consistent with the procedures required by Henderson. The court also noted that defendant's arguments regarding the identification made by B.P. only went to estimator variables and, thus, did not show any suggestive conduct by the police.

With regard to the identification made by L.B., the trial court found that the blind administrator's instructions were consistent with the instructions called for by Henderson. The court then went on to hold that the remarks by the investigating detective, which preceded the appropriate instructions, did not establish suggestiveness.

On appeal, defendant does not challenge the court's findings regarding the initial request for a Wade hearing. Rather, defendant presents a new ground to support his request. That is, he relies on testimony from trial to argue that the

lead investigating detective met with B.P. and L.B. prior to their photo arrays. Defendant concedes, however, that he did not renew his request for a Wade hearing at trial when that testimony was first heard.

Regarding L.B.'s pretrial identification, defendant relies on trial testimony of the detective who administered the photo array. That detective testified that before she conducted the photo array, the lead detective spoke with L.B. privately for a few minutes. In that regard, the detective testified as follows:

> [Assistant Prosecutor:] What happened when you arrived at the home?
>
> [Detective:] I remained outside with [a third detective]. [The lead detective] went in, and he then came back out a few minutes later.
>
> [Assistant Prosecutor:] What happened next?
>
> [Detective:] I went - - I went into the apartment, and showed the victim six photographs.
>
> [Assistant Prosecutor:] At what point did [the lead detective] give you the photographs?
>
> [Detective:] In the - - in the hallway.

On cross-examination, the detective explained further:

| | |
|---|---|
| [Defense Counsel:] | And you get out of the car, and you make your way into [L.B's] house, and only [the lead detective] goes in to speak to her initially; correct? |
| [Detective:] | Correct. |
| | . . . . |
| [Defense Counsel:] | How long was he in there with her before you went - - end up going in showing the photo array? |
| [Detective:] | I didn't time it, but a few minutes. |

The recording of the photo array procedure with L.B. begins with the lead detective speaking with L.B. alone for approximately one minute and eighteen seconds before leaving the room, at which time the blind administrator detective enters. During that initial discussion with L.B., the lead detective confirmed L.B.'s identity, the location of the identification procedure, and explained that he was there with other law enforcement officials for the purpose of conducting a photo array. L.B. agreed to participate in the identification procedure, and at that time, the lead detective left the room. Based on the blind administrator detective's testimony that the lead detective spoke with L.B. for "a few minutes" before she conducted the photo array, it is unclear whether the recording

21

captured the entirety of L.B.'s conversation with the lead detective, as the recording includes a conversation that is less than two minutes in duration.

As to B.P.'s pretrial identification, defendant relies on the lead detective's testimony, when he stated:

> [Lead Detective:] We met with [B.P.]
>
> [Assistant Prosecutor:] Where?
>
> [Lead Detective:] On the street. I contacted him. . . . We found him. We told him that we made some developments. We told him we needed him to come back to the office with us. He alerted his supervisor, advised him. He was okay, and authorized him to come with us, and then we brought him back to the office.
>
> [Assistant Prosecutor:] So, the photo array was done at your office?
>
> [Lead Detective:] Yes.
>
> . . . .
>
> [Assistant Prosecutor:] And at what point did you hand off the photo array?
>
> [Lead Detective:] Again, I walked [B.P.] into the interview room, I opened the statement, went over the same things I did with [L.B.]. I

excused myself out of the room. Went up to [the blind administrator], handed her the array package, and said, you're ready, can you go show this.

The recording of the photo array procedure with B.P. begins with the lead detective speaking with B.P. in the presence of another detective for approximately two minutes before both detectives leave the room, at which time the blind administrator enters. During the initial recorded discussion with B.P., the lead detective confirms B.P.'s identity and contact information, the location of the identification procedure, and then explains the photo array procedure, which B.P. agrees to participate in. At that time, the two detectives leave the interview room. There is no recording or contemporaneous written account as to any conversation between B.P. and the investigating detectives during the drive to the police station or the walk to the interview room.

Accordingly, the trial testimony suggests there were unrecorded conversations between the witnesses and the lead investigating detective immediately before the pretrial identification procedures. We, therefore, hold defendant is entitled to a full Wade hearing. See Anthony, ___ N.J. at ___ (slip op. at 26-27). Under Rule 3:11(c), law enforcement was required to provide a detailed summary of any conversations between a witness and other individuals

A-2854-16T3

with whom the witness discussed the identification before the official identification procedure occurred. See R. 3:11(c)(8). The record provided to us contains no such detailed summary.

We note that Anthony did not directly address the instant situation where evidence of unrecorded conversations involving the pretrial identification procedures first came to light at trial and defense counsel did not renew a request for a Wade hearing. Nonetheless, the witness identifications were crucial at defendant's trial, and thus, defendant should have an opportunity to explore the reliability of those identifications due to the witnesses' conversations with the lead investigating detective prior to identifying defendant in the photo arrays. Consequently, we remand for such a hearing consistent with the requirements set forth in Wade, Henderson, Delgado, and Anthony.

We express no view as to the outcome of the Wade hearing on remand. If, however, "damaging evidence about feedback, witness confidence, or some other factor that affects memory is developed at the hearing, [defendant] may have a strong case and [may] be entitled to a new trial." Anthony, ___ N.J. at ___ (slip op. at 33-34). In such a circumstance, the trial court will need to make a decision on whether defendant is entitled to a new trial. Alternatively, if the evidence presented at the hearing does not show that any violations of Rule

3:11(d) were "clearly capable of producing an unjust result," and that the out-of-court identifications were reliable, then defendant's convictions can stand. See id. at ___ (slip op. at 34) (quoting R. 2:10-2). That determination will also need to be made in the first instance by the trial court after the full Wade hearing.

In light of the remand for a full Wade hearing, we need not reach defendant's argument that he should have been present when the court initially addressed the request for a Wade hearing. Defendant will have the right to be present at the hearing we are directing on remand. In that regard, we point out that criminal defendants generally have the "right to be present in the courtroom during every 'critical stage' of the trial." State v. Reevey, 417 N.J. Super. 134, 149 (App. Div. 2010) (quoting State v. Zenquis, 251 N.J. Super. 358, 363 (App. Div. 1991)). See also R. 3:16(b) (providing that a "defendant shall be present at every stage of the trial").

C.    The Sentence

Finally, defendant argues that his sentence should be vacated because the sentencing court erroneously weighed the applicable aggravating and mitigating factors. We disagree.

We review sentencing determinations under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606

(2013)). We do not substitute our judgment for the judgment of the sentencing court. Lawless, 214 N.J. at 606 (first citing State v. Cassady, 198 N.J. 165, 180 (2009); then citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Instead, we will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Miller, ___ N.J. ___, ___ (2019) (slip op. at 15-16) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).]

At sentencing here, the court found aggravating factor nine, the need for deterrence. N.J.S.A. 2C:44-1(a)(9). The court also found one mitigating factor; that defendant had no prior criminal record. N.J.S.A. 2C:44-1(b)(7). The court placed significant weight on aggravating factor nine and determined that that aggravating factor "substantially" outweighed the mitigating factor. The court's findings concerning aggravating factor nine and mitigating factor seven are supported by credible evidence in the record. Moreover, we discern no abuse of discretion in the court's balancing of the aggravating factor relative to the mitigating factor.

A-2854-16T3

On appeal, defendant argues the court improperly relied on the harm suffered by the victim in determining that aggravating factor nine substantially outweighed mitigating factor seven. At sentencing, however, the court explained that it weighed aggravating factor nine "very heavily" for two reasons: (1) defendant committed a first-degree offense; and, (2) that offense was "a very traumatic experience for [the victim] as it would be for anyone." In evaluating the need for deterrence, the courts may consider the degree of the offense and the gravity and harm of the crime. See Fuentes, 217 N.J. at 79 ("[D]emands for deterrence are strengthened in direct proportion to the gravity and harmfulness of the offense." (alteration in original) (quoting State ex rel. C.A.H. & B.A.R., 89 N.J. 326, 337 (1982))); State v. Carey, 168 N.J. 413, 426 (2001) ("The need for public safety and deterrence increase proportionally with the degree of the offense."). Accordingly, the court did not abuse its discretion in finding a compelling need for deterrence after considering the degree of the offense that defendant committed and the gravity and harm of that offense.

Just as importantly, we discern no abuse of discretion in the court's imposition of the sentence. Defendant was found guilty of one first-degree crime (armed robbery), and two second-degree crimes (possession of a weapon for an unlawful purpose and unlawful possession of a handgun). The court

correctly merged the possession of a weapon for unlawful purpose with the robbery conviction. The court then imposed a twelve-year sentence for the first-degree crime, which was below the mid-range for a first-degree crime (ten to twenty years). The court also imposed a concurrent sentence of five years for the conviction of second-degree unlawful possession of a handgun. That sentence was within the guidelines and does not shock the judicial conscience.

Affirmed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2854-16T3